## Case No. 221.

### ALLEN v. DALLAS & W. R. CO.

[3 Woods, 316.][2]

Circuit Court, W. D. Texas. Aug., 1878.

**RAILROADS — BONDS AND MORTGAGES — FORECLOSURE—RECEIVERS.**

1. Service of notice or process upon the officer of a railroad company, authorized by its charter or the law to receive service, is good, although such officer may fraudulently conceal the fact of such service from other officers of the company.

2. But where such officer fraudulently conceals the service upon him of a motion for the appointment of a receiver of the property and effects of the railroad company, and by means of such concealment the company fails to resist such appointment, and claims that the same is an invasion of its rights, and ought not to have been made, the court will re-open the case and allow the company to move to vacate the appointment.

3. An unreasonable delay in making the motion to vacate the appointment of the receiver will be regarded as an acquiescence in such appointment.

4. Persons who hold negotiable railroad bonds as collateral security for the payment of debts due them by the railroad company, are bona fide holders for value, and are entitled to enforce the payment of the bonds as long as the debts for which they were hypothecated remain unpaid.

5. Where a deed of trust executed by a railroad company mortgaged its income and profits, as well as its railroad and other property, to secure the payment of the principal and interest of its bonds, and authorized the trustees, in default of the payment of the interest, to take possession of the mortgaged property, and apply the income to the payment of the interest: Held, upon the application of the trustees, that such default was a sufficient ground for the appointment of a receiver.

6. In such a case, the appointment of a receiver should not be denied because it is not shown that the property mortgaged is insufficient to pay the mortgage debt, or that it is in jeopardy, or that the company is insolvent, or because the amount due on some of the bonds is in dispute.

7. The charter of a railroad company conferred on it a large grant of land, but provided that unless twenty miles of its road were completed and in order for use before a date named, both the charter and the land grant should become forfeited. The company had issued and sold 250 bonds of $1,000 each, which were secured by a deed of trust on its road and other property. The company was insolvent. About two miles of the twenty miles of its track remained to be built, and little over one month of the time limited for the completion of the twenty miles remained. The company was unable to procure the means to build the remaining two miles, the contractor for building the road had failed and had abandoned his contract, and there was imminent danger of the forfeiture of the charter of the company and of its grant of lands. Held, that under these circumstances, it was the duty of the court, upon the application of trustees of the bondholders, to appoint a receiver, with authority and orders to complete the twenty miles of road within the time limited by the charter.

8. Where a contractor for constructing a railroad was entitled, under his contract, to the possession of the road until his contract was completed, and he received from the railroad company a large number of bonds which were secured by a trust deed on the road, which authorized the trustees to take possession of the road upon default in the payment of the interest on the bonds, and the contractor transferred the bonds for value: Held, that his right to the possession of the road, under his contract with the company, was subordinate to the right of the trustees to the possession upon default in the payment of interest on the bonds.

[In equity. Suit by Thomas Allen and George H. Nettleton against the Dallas & Wichita Railroad Company for foreclosure of mortgage.] Heard at chambers, on motion of defendants to vacate order for appointment of receiver. [Motion overruled.]

On May 24, 1878, the complainants filed their bill, and moved at chambers, before the circuit judge, for the appointment of a receiver of the property and effects of the

---

[1][Reported by Hon. William Cranch, Chief Judge.]

[2][Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

defendant railroad company. Counsel appeared for the railroad company and the defendant Malcolm Henderson, who was a contractor for the construction of the railroad, and was alleged to be in possession of its track and other property, and, upon the showing made by the bill and the testimony submitted, the court appointed a receiver, the defendants' counsel making no opposition. The receiver took possession of the property of the defendant railroad company on May 27, and proceeded, under the authority of the orders of the court, to expend about $5,000 thereon. Afterwards, on June 26, a notice was served on complainants that, on July 8, the defendant railroad company and Silas Reed, also a defendant, would move the court to vacate the order for the appointment of a receiver upon the answers and affidavits on file. Complainants and defendants being both represented by counsel, the motion of the defendants was heard upon July 8, the day named in the notice.

The bill was filed by Thomas Allen and George H. Nettleton, citizens of Missouri, as trustees named in a deed of trust executed by the defendant railroad company to secure its first mortgage bonds. The bill averred, in substance, that the Dallas & Wichita Railroad Company was duly incorporated by the state of Texas to construct and use a railroad from Dallas, in said state, northwestwardly through the town of Denton to any point on the waters of the Red or Canadian rivers, within the territory of Texas. That the company had constructed a railroad from Dallas to an unnamed point about 18 miles distant, in a northwestwardly direction, and was maintaining and using the same. That the legislature had granted to the railroad company sixteen sections of land, of 640 acres each, for every mile of railroad constructed by it, in accordance with the provisions of the act making the grant, and that the company had received a portion of said lands. On June 5, 1877, as the bill alleged, the railroad company had constructed ten miles of its road, and for the purpose of securing 1,250 bonds, of $1,000, each, to be issued by it, in order to raise money thereon to complete its line of road, did, being duly authorized so to do, execute and deliver to complainants, as trustees, a deed of trust upon all the right and title which the company had or might thereafter acquire in lands granted to it by the state of Texas by act approved May 24, 1873, and also upon the railroad of said company then or thereafter to be constructed from the city of Dallas, for the distance of one hundred miles in a northwestwardly direction, and all its equipments then owned or to be thereafter purchased, and "all the income, revenue and tolls of said railroad and property and all the franchises and rights" of said company, and all property of any description acquired and to be thereafter acquired by it.

The bonds were made payable to complainants as trustees, or bearer, on July 1, 1897, at the office of the Union Insurance Company in New York, with interest at the rate of seven per cent per annum, payable semiannually at the place aforesaid, on the first days of January and July of each year, and as the bonds declared, "on the presentation and surrender of the annexed coupons as they severally fall due;" and in case of default in the payment of any semi-annual installments of interest which had become due and had been demanded, and in case such interest should remain unpaid for three months after such default and demand, then the principal of the bonds might be declared and made due in the manner provided in the deed of trust. The deed of trust also provided that upon default in the payment of the principal or interest, and a continuance of such default for the period of three months, then all of said bonds should immediately become due, and it should be competent and lawful for said trustees to enter upon and take possession of the premises and property conveyed by the trust deed, and upon the written request of the holders of one-tenth of said bonds, at any time outstanding and unpaid, it was made the duty of said trustees to enter upon and take possession of all the trust property, and to have, use and employ the railroad and all its appurtenances and property thereto belonging and proper for its use, and to manage and operate the same, and to apply the proceeds thereof pro rata to the payment of the principal and interest of the bonds outstanding and unpaid, for all which they were to receive a reasonable compensation. Or they might cause the trust property, or so much as might be necessary to pay the amount due and unpaid on said bonds, to be sold after ninety days' notice, and upon such sale to make and deliver to the purchaser a deed in fee simple for the same, and to apply the proceeds of such sale, after paying the costs and expenses of the sale, to the payment of the principal and interest of said bonds. The deed of trust further provided that it should be lawful for the railroad company to manage and use said railroad and property, and to receive and dispose of the current revenues thereof until default in the payment of the principal or interest of said bonds, or some of them. After the said deed of trust had been duly executed and recorded, the railroad company, according to the averments of the bill, executed and sold in the market, for a valuable consideration, its two hundred and fifty bonds of one thousand dollars each, all dated July 5, 1877, payable, both principal and interest, as above stated, and the bonds are all outstanding, and are now owned by bona fide purchasers for value. The railroad company made default in the payment of the interest due on said bonds on January 1, 1878, and payment thereof was demanded, and such

default continued more than three months after such demand, and it was therefore claimed and averred that all said bonds, both principal and interest, had become due, and it was averred that all the holders of the bonds had united in a request to the complainants, as trustees, to enforce the said deed of trust and the trust thereby created.

The bill further alleged that the defendant Malcolm Henderson was and had been in possession of the company's railroad, receiving the tolls and profits thereof ever since the execution of said mortgage, under a contract whereby he was to construct said railroad for a certain consideration, and in the mean time, and while such construction was going on, to possess and use the same, and said Henderson had not only failed to provide for and pay the interest on the bonds issued by the company, but had stopped the further construction of the railroad. The charter of the railroad company, and the acts of the legislature amendatory thereof, declared that unless twenty miles of its railroad should be fully completed and in operation by the first day of July, 1878, the charter, with the land grant thereto attached, should become forfeited, whereby the security of the bondholders would be wholly lost. Henderson, in the construction of the eighteen miles of said railroad, had contracted many debts for labor and materials; suit had been brought on the same against the railroad company, and judgment obtained thereon against the company, although said debts were the debts of Henderson, and executions had issued on the judgments, and the railroad had been levied on and advertised for sale. The complainants further alleged that they were apprehensive, not only that the charter of said railroad company would become forfeited, but that the income and tolls of said railroad would be wholly diverted from the payment of the interest on the bonds, and applied to the payment of said judgments and other unsecured claims against said Henderson and the railroad company. Henderson, Silas Reed and other persons, who, it was alleged, had, or claimed, some interest or lien upon the railroad, were made defendants to the bill, and the bill prayed for the appointment of a receiver to take possession of the railroad and other property of the railroad company, and to manage and use the same, and for a foreclosure and sale of the property covered by the deed of trust. This bill was verified by the oath of Geo. H. Nettleton, one of the complainants, who swore that he had read and knew the contents thereof, and that he believed the same to be true.

Upon the statements of the bill, and the production of the coupons due January 1, 1878, with the protest of the notary showing demand of payment on that day and non-payment, and proof that the holders of all the bonds had united in a request to the trustees, complainants, that they should enforce said deed of trust and the trusts thereby created, and no objection being made by either the railroad company or the defendant Henderson, the court appointed Ira Harris, the secretary of the Kansas Rolling Mill, receiver of the said trust property.

The grounds of the motion to discharge the receiver were: 1. That the railroad company was not served with notice of the motion to appoint a receiver, and the appointment, so far as it was concerned, was ex parte. 2. That the railroad company had never negotiated any of its bonds, and that there had been no default on its part. 3. That there was, in fact, no necessity for the appointment of a receiver, and upon all the facts of the case one should not have been appointed.

Alexander White, for the motion.
J. Brumback and C. W. Blair, contra.

WOODS, Circuit Judge. 1. The facts concerning notice to this company, of the motion for the appointment of a receiver, were these: A notice was served on J. W. Calder, the vice-president of the company, on May 18, 1878, in the city of Dallas, Texas, where the principal office of the defendant railroad company was, during the absence from the city of W. H. Gaston, the president, and Calder authorized counsel to appear for the railroad company. The service of a notice upon the vice-president of the company, under these circumstances, was a good service upon the company, according to the statutes of Texas and the by-laws of the company. No objection was made by Calder to the form of the notice or the manner in which it was served on him. Neither the complainants nor their counsel were responsible for what Calder did after this notice was served on him. He was the representative of the company, appointed by it, and if he was an unfaithful agent, the principal of the agent, according to the general law, and not other parties, must suffer by his neglect or misconduct. There is no proof and no claim that either the complainants or their counsel were in any complicity with Calder to prevent notice of the motion for a receiver from coming to the knowledge of other officers of the company. The proof shows that Calder was acting as agent for one of the bondholders, and that he did not communicate the fact that a motion was to be made for a receiver to any other officer of the company. There is no doubt, also, that if the president and other agents of the company had received notice of the motion, the company would have resisted it, and there is little doubt that Calder purposely kept them in ignorance of the fact that the motion was to be made. This is the conviction left on my mind by all the evidence. Waiving for the present any consideration of the delay of the defendants in giving

notice of their purpose to make the present motion, under the circumstances of the case, if now, any of the defendants in interest can make it appear that the appointment of a receiver by the court was an invasion of their rights, that the facts did not justify such an appointment, and that the same was unadvisedly and improvidently made, I think they ought to be heard and the appointment revoked, and the condition of things before the appointment, as far as possible, restored. The question, therefore, is presented whether, in view of all the facts now made to appear, the court should in the first instance have appointed a receiver. To sustain its side of this issue, the railroad company has filed its own answer, sworn to by W. H. Gaston, its president, the answers of Silas Reed, A. T. Obenhain and Jules Schneider, and the affidavits of W. H. Gaston, president, and Geo. Shields, secretary of the railroad company, and W. M. Johnson, engineer. The complainants, to sustain the appointment of the receiver, offer the bill verified, as before stated, by one of the complainants, and the affidavits of Wallace Pratt, C. W. Blair, J. W. Calder, Ira Harris, W. L. Doane, J. Brumback, J. B. J. Fenton and C. F. Stevens. They also again produce 250 coupons due January 1, 1878, cut from the first mortgage bonds of the railroad company, with evidence of their presentation for payment and of their nonpayment.

2. The claim that the railroad company has never issued its bonds and that no default has been made in the payment of the coupons is entirely unsustained. On the contrary, the proof is conclusive not only that the bonds were issued by the company, but that it received full value for every bond issued. The facts, as shown by the testimony, are as follows: One Alexander Calder was a creditor of the railroad company to the amount of twenty thousand dollars, for which he held the obligation of the company, secured by a mortgage duly recorded on February 12, 1876, on the company's road and property; and that, to secure a release and cancellation of this mortgage, the railroad company caused to be transferred to him sixty of the first mortgage bonds in suit, to be held by him as collateral security for the payment of his claim. This stipulation was carried into effect. The sixty bonds were delivered to W. E. Hughes, as trustee for Alexander Calder, who thereupon dismissed a suit which he (Calder) had commenced in this court to foreclose his mortgage, and entered a release of the mortgage on record. Afterwards, about April 1, 1878, the railroad company having failed to comply with the stipulations which said bonds were pledged to secure, the same were, in strict conformity with the terms of the contract of pledge, sold in New York city after due notice by an auctioneer, and bought in by said Alexander Calder, who thereupon

became their absolute owner. As to the remaining one hundred and ninety bonds, the proof shows that they were delivered by the railroad company to Malcolm Henderson, the contractor for the construction of the railroad, in payment of the work done and to be done by him, and to enable him to procure materials to carry on and complete his contract for the construction of the railroad, and that by the assent of Henderson and of the railroad company, the one hundred and ninety bonds were transferred to Ira Harris, the agent of the Kansas Rolling Mill, as trustee, to hold as collateral security for the payment of certain notes given by Henderson to the Kansas Rolling Mill Company, for iron furnished for the railroad, and which had been laid down in the track, and with power to sell said bonds at public or private sale in the event the said notes of Henderson were not paid at maturity, the proceeds of the sale to be applied to the payment of Henderson's notes. In fact, all the iron used in laying the track of the railroad was furnished by the Kansas Rolling Mill Company, and it has received nothing therefor except the notes of Henderson, secured by the transfer of the said one hundred and ninety bonds. Henderson paid nothing on his notes to the Kansas Rolling Mill Company, and on May 3, 1878, the one hundred and ninety bonds were sold to one W. L. Doane, who claimed to be the holder and in possession of the same. There is nothing in the record to show that, while Alexander Calder and the Kansas Rolling Mill Company held these bonds, they were not holders for value without notice, nor is there anything in the record tending to show that there are any defenses whatever which the railroad company could set up, even as against Henderson, the first transferee of the bonds. On this state of facts, which is clearly shown by the proof, and which there is no satisfactory evidence to contradict, it is hard to conceive on what grounds the railroad company can claim that it never issued or negotiated its bonds. Even if the bonds were still held by Alexander Calder and the Kansas Rolling Mill Company as collateral security, they would be bona fide holders for value and entitled to enforce the payment of the bonds, as long as the debts for which they were hypothecated were unsatisfied: Wheeler v. Newbould, 16 N. Y. 392; Alexandria, etc., R. Co. v. Burke, 22 Grat. 254; Goodman v. Simonds, 20 How. [61 U. S.] 343. The claim is further interposed by the railroad company that there was an understanding that the coupons due January 1, 1878, were to be cut from said bonds delivered to the Kansas Rolling Mill Company before the same were so delivered. The proof utterly fails to sustain this claim. The agent of the Kansas Rolling Mill, who was engaged in transacting this business, swears that they never heard of any such understanding until it was set up in the an-

swer of the railroad company, and the joint written order of Henderson and Gaston, the president of the railroad company, dated November 2, 1877, is produced, directing the trustees of the trust deed to deliver to Harris, trustee for the Kansas Rolling Mill Company, the one hundred and ninety bonds in question, "to be held by him as collateral security for the payment of iron delivered in Dallas to the said company, pursuant to contract." In this order nothing is said about detaching the coupons due January 1, 1878, and the proof shows that the rolling mill company was entitled to the possession of one hundred and twenty-five of these bonds as early as May, 1877. As to the sixty bonds held by Alexander Calder, it is not claimed that the coupons due January 1, 1878, were not properly transferred with them. I conclude, therefore, that the 250 bonds of the railroad company were issued and put in circulation, that they are held bona fide and for value by either Alexander Calder and the Kansas Rolling Mill Company or those to whom they have been transferred, and that default has been made by the company in the payment of the interest due January 1, 1878.

3. It remains to consider whether there was any necessity for the appointment of a receiver, and whether, under all the circumstances as they now appear, a receiver should have been appointed. In my judgment, independent of any necessity for the appointment of a receiver to protect and preserve the trust property, it was the right of the bondholders, under the terms of the trust deed, to have a receiver appointed to take possession of the trust property. The rights of holders of negotiable bonds issued by a railroad company and secured by a mortgage on its property are not to be measured by the same rules as are applied to an ordinary mortgage of a farm or house and lot, to secure one or two notes held by one mortgagee. In this case the trust deed pledged the receipts and income of the railroad property for the payment of the principal and interest of the bonds. It declared that after three months' default in the payment of the principal or interest on the bonds, or any part of either, upon the written request of one-tenth of the holders of the bonds, it should be competent and lawful for the trustees to enter upon and take possession of the trust property, and upon the written request of one-tenth of the holders of the bonds, it should be the duty of the trustees to enter upon and take possession of the trust property, and to use and employ the said railroad and the property and appurtenances proper for its use, to make all necessary repairs, pay all proper expenses of the management thereof, including taxes, and to apply the proceeds to the payment, pro rata, of the principal and interest due on the bonds. In short, it was made the duty of the trustees, in the contingency named, to exercise the rights and perform the duties of receivers appointed by the court. These provisions were inserted in the deed of trust to give credit to the bonds, to enhance their value and induce capitalists to purchase them. They constituted a part of the consideration which the railroad company offered to purchasers of its bonds: State v. Northern Cent. R. Co., 18 Md. 193; Dumville v. Ashbrooke, 3 Russ. 99, note. A mere default in the payment of the debt is no ground for the appointment of a receiver, but this is not true where there is a stipulation in the mortgage that the mortgagee shall have the rents: Whitehead v. Wooten, 43 Miss. 523; Morrison v. Buckner, [Case No. 9,844.]

Are all these provisions of the deed of trust to be disregarded? If not, are the rights of the bondholders impaired by the fact that the trustees, instead of taking possession of the trust property, as they had a right, and it was their duty to do, have applied to this court to assist them in the execution of the trust whose duties they had assumed. These trustees might, as is sometimes done, have first taken possession of the trust property, under the authority of the trust deed, and upon written demand of one-tenth of the bondholders, and afterwards filed their bill asking the court to protect their possession and aid and instruct them in the discharge of their trust. Such a course would have been perfectly proper and competent. But having chosen to file their bill in the first instance, neither they nor any bondholder has lost any right, and it is the clear duty of the court to give them all the rights conferred by the deed of trust. By the terms of this trust deed the bondholders, upon default in the payment of interest, are entitled to have the income and profits of the trust property applied to the payment of their debt. This can be done only by possession taken of the trust property, either by the trustees or a receiver. By a failure to take possession the bondholders are in danger of losing their right to the income and profits: American Bridge Co. v. Heidelbach, 94 U. S. 798. It is evident that the rules applicable to the appointment of a receiver upon an ordinary mortgage do not apply here. The bondholders are not precluded from the appointment of a receiver because it is not shown that the property is insufficient to pay the mortgage debt, that the mortgagee [mortgagor] is insolvent, or that the trust property is in jeopardy, or because the amount due is in dispute, etc. For instance, are the rights of Alexander Calder to proceed on his sixty bonds, no part of which are in dispute, to be affected because some unfounded claim is set up, that some of the coupons due January 1, 1878, held by the Kansas Rolling Mill Company, are not justly due? The rights of one holder of bonds are not to be impaired because some dispute may be started affecting the rights of another holder: High, Rec. § 387. The value of railroad bonds, as commercial paper, depends in large

degree upon the punctual payment of the interest as it falls due. The trust deed has therefore provided not only a pledge of the income and profits of the trust property to pay the interest and principal of the bonds, but has pointed out the method by which, in default of the company to pay the interest, the bondholders may compel the application of the issues and profits to its payment as it matures. Therefore, under the terms of the trust deed, I should feel compelled, upon demand made upon the trustees by one-tenth of the bondholders, to appoint, upon a bill filed for that purpose, a receiver, through whose agency the bondholders could enjoy all their rights, and it would be no answer to such an application to say that the trust property was sufficient to pay all the bonds, or that some of the bonds were in dispute, or that the corpus of the trust property was in no danger. Regarding, therefore, only the terms of the trust deed, upon proof of a three month's default in the payment of interest, and of a written request made by one-tenth of the holders of the bonds upon the trustees, that they exert the powers conferred upon them by the trust deed, it would be the duty of the court, without further showing, to appoint a receiver, so that the value of the bonds, as commercial paper, might be preserved, and all the rights of the bondholders secured.

But independent of the peculiar terms of the trust deed, the situation of the trust property, as shown by the evidence, was such as, in my judgment, to justify and require the appointment of a receiver at the time when the application was first made. It sufficiently appears that the main reliance of the railroad company for means to construct its road, was on the sale of its first mortgage bonds. It is true, it had a land grant from the state, but this could only be secured as the sections of the road were completed, and could only be used as a means of affording additional security and value to the bonds. The condition of the railroad company on May 24, 1878, the date at which the receiver was appointed, appears by the proof to have been as follows: The company had issued its bonds to the amount of $250,000, on which the coupons due January 1, 1878, were unpaid, and the bonds held as collateral security had been sold in New York city, at fifty cents on the dollar. The company had allowed judgments to be recovered against itself, on which executions had been issued and the company's property advertised for sale, and on one judgment a sale had been actually made. In short, the company was insolvent, and without means either to pay the interest on its bonds, or to construct its road. Malcolm Henderson, with whom the railroad company had contracted for the construction of its road, had failed, and had abandoned the work of construction. Reed, who appears to have been a subcontractor under

Henderson, or in some way connected with him, was in possession of the railroad, about eighteen miles of which had been completed, and was receiving its issues and profits. As already stated, if twenty miles of the railroad were not completed by July 1, 1878, the charter of the railroad company and its land grant would become forfeited, and the security of the bondholders be entirely lost. There was not sufficient iron on hand to complete the road for the remaining two miles, necessary to be completed to save the charter and land grant. This was the condition of affairs when the application for the appointment of a receiver was made and granted. It is true, that after the appointment of the receiver, and before the order of appointment had reached the city of Dallas, the defendant Reed, who, according to the answer of the railroad company, was engaged in the construction of the railroad under a contract with Henderson, had, as he alleges, entered into a contract with a competent engineer to complete said railroad a distance of nineteen and a half miles by June 7. But by the showing of the railroad company and of Reed, no such contract had been made when the receiver was appointed. The significant and unexplained fact remains, however, that even this contract did not provide for the completion of the road for the distance of twenty miles in due time to avoid the forfeiture of the charter and the land grant. It is true that the railroad company, speaking by Gaston, its president, says that it had no doubt that Reed would have completed the road for the distance of nineteen and one-half miles by June 10, and upon information and belief, that he could have completed the road for the distance of twenty miles by July 1, and that the president of the railroad company had received assurance and ample indemnity from Reed that he would have finished the road the distance of twenty miles by July 1, and Reed declares in his answer his purpose to have finished the road the distance, and within the time necessary to save a forfeiture of the charter. In what shape the assurances [were] received by the president from Reed, whether verbal or in writing, is not shown. What the ample guarantee was is not stated. Could it be expected that a court, where interests amounting to more than $250,000 were depending, should be satisfied with such a showing as that? If Reed intended, in good faith and without seeking any undue advantage, to construct the twenty miles of road by July 1, why did he not contract with competent engineers to construct the road to the twenty mile point, and not to the nineteen and a half mile point? If he intended to allow the use of the road which was in his possession to carry the iron necessary to lay the last half mile, why did he decline to enter into a contract to that effect, as required by the city council of Dallas? Stevens, who was the engineer

with whom Reed contracted to build the road to a point nineteen and one-half miles distant from Dallas, swears that Reed would not contract for laying the track to the twenty-mile post, and refused to provide the necessary material for that purpose.

The condition, in short, was this: the railroad was insolvent and its property under execution; it was unable to furnish means to complete the twenty miles of its road in time to save the forfeiture of its land grant and charter. Henderson, the person with whom the company had contracted for the construction of its road, was insolvent and had abandoned the work. When the receiver was appointed there was no provision made by contract for completing the twenty miles, and it was three days after the appointment of a receiver that Reed, a subcontractor under Henderson, entered into a contract with Stevens for the completion of the road for the distance of nineteen and one-half miles. It seems to me that, under this state of facts, when such fatal consequences to the interests of the railroad and bondholders were threatened, it was the duty of the court to interfere by the appointment of a receiver, and that it would have been an indefensible trifling with the rights of others if the court had refused the application, relying on the assurance, fairly presumed to be verbal, which Gaston says he received from Reed that the latter would complete the road twenty miles by July 1, and on the guarantees which Gaston says he received from Reed, but whose nature he does not reveal.

It is urged in behalf of the possession of Reed, which was displaced by the receiver, that Henderson's contract for construction antedated the deed of trust and provided that Henderson should retain the possession of the road and receive its issues and profits until the completion of the contract of construction, and that Reed had all the rights of Henderson, and his right to possession and use and enjoyment of the railroad under the construction contract was older and better than the rights of the trustees named in the trust deed. Conceding that Reed stands in the shoes of Henderson, what were Henderson's rights under the facts? He transferred, as collateral security to the rolling mill company, one hundred and ninety bonds secured by a deed of trust which, on a certain default, gave the trustees the right to take possession of the railroad company's property and receive its rents and profits. As between him, therefore, and the trustees, he would be estopped from asserting his right of possession under his contract for construction. The transfer of the bonds, secured by such a deed of trust, was a clear waiver of his rights under his contract. So that neither Henderson nor Reed can be heard to claim possession as against the trustees of the deed of trust.

It has been urged by counsel for the railroad company that the plaintiff is never entitled to a receiver when the equities of the case are fully and fairly denied by the sworn answers of the defendant. This is true when the motion for a receiver is heard on bill and answer only. But when there is other evidence besides the bill to support the application, the court will consider whether the evidence adduced in support of the bill does not overcome the denials of the answer, and if they do, the receiver will be appointed, notwithstanding the denials of the answer: Thompsen v. Diffenderfer, 1 Md. Ch. 489; Simmons v. Henderson, Freem. Ch. (Miss.) 493; Henn v. Walsh, 2 Edw. Ch. 129; Buchanan v. Comstock, 57 Barb. 568; Fairbairn v. Fisher, 4 Jones Eq. 390; Callanan v. Shaw, 19 Iowa, 183; Rhodes v. Lee, 32 Ga. 470. It is in all cases a question of evidence. If on a consideration of all the proof, the court thinks a case is made for the appointment, a receiver will be appointed, notwithstanding the denials of the answer. In this case, it seems to me that the proof to justify the appointment was ample. But in the view I have taken of the case, the answer does not deny the equities of the bill. On the contrary, enough is admitted fully to warrant the appointment, namely, the terms of the trust deed, the issue of at least $125,000 in bonds with all coupons attached, for a valuable consideration, default in the payment of the interest for three months, and the demand of the bondholders on the trustees that they should execute the powers conferred by the trust deed.

It has been ably insisted that the interests of the railroad company and of the people of a large part of the state of Texas will be injured by the action of the court, and that these considerations ought to aid the discretion of the court in coming to a conclusion adverse to the appointment of the receiver. These considerations cannot weigh when the rights of creditors are involved. But so far as the railroad corporation is concerned, it cannot justly complain. And as to the people of Texas, it seems clear to me that they are interested only in the railroad, and are not at all concerned about the railroad company. The appointment of a receiver does not put an end to the construction of the railroad. It only takes it from the hands of an incompetent and insolvent corporation, and gives it to other and more vigorous agencies.

My conclusion upon the whole subject is, that if on May 24, when the receiver was appointed, the same evidence had been presented and the same arguments made as have been on this hearing, I should have felt constrained to appoint a receiver according to the prayer of the bill. Finally, a sufficient reason why the order appointing the receiver should not be revoked is, that the motion for that purpose comes too late. The receiver appointed by the court went forward promptly and vigorously in the discharge of his du-

ties, and within the time limited he completed the railroad to the twenty-mile point, and thus saved the forfeiture of both the railroad charter and land grant. In doing this he expended the sum of five thousand dollars. The iron necessary to complete the track was furnished by the Kansas Rolling Mill Company. The receiver took possession of the railroad on May 29, of course with the full knowledge of the railroad company and of Silas Reed, who, up to that time, had been in possession. It was not until June 26 that notice of the present motion was given. The officers of the railroad company, as soon as the receiver took possession of the road, learned how the notice of the motion to appoint the receiver had been served, to wit, on Calder, the vice-president. If they intended to claim that the notice was insufficient and defective, it was their duty to move at once. The delay of nearly a month, while the receiver was going on with the construction of the road and expending money and materials, furnished certainly not by the railroad company, but by others interested in its prosecution, was an acquiescence in the action of the court, and they are estopped now from making objection. It was not until the receiver had completed the railroad to the twenty-mile post and secured the railroad charter and land grant from forfeiture that notice of this motion was given. On the whole case, I am well settled in the opinion that the motion to vacate the appointment of the receiver should be overruled, and it is so ordered.