## *In re* STERLING, AHRENS & Co.

(*District Court, D. Maryland.* January 3, 1880.)

ACCOMMODATION NOTES—VENDOR AND VENDEE.—Notes made by a vendee in excess of the value of the goods, and before the same have been delivered, for the convenience of the vendor, are accommodation notes, and the vendor is primarily liable for the same.

SAME—BANKRUPTCY—CLAIMS—DIVIDENDS.—The insolvent maker of such accommodation notes can only prove, against the estate of the bankrupt payee, the amount of the dividend actually paid by him on such notes.

In bankruptcy.

MORRIS, J. The bankrupts were merchants doing business in the city of Baltimore, and, prior to their failure, in August, 1875, were very largely engaged in importing sugar. They were also the agents of the Calvert Sugar Refining Company, a corporation largely engaged in refining sugar. Walter B. Brooks was elected assignee of the estate of the bankrupts, and about the same time the Calvert Sugar Refining Company, being also insolvent, executed a voluntary deed of assignment, for the benefit of its creditors, to Benjamin F. Newcomer and C. Morton Stewart. These trustees found that the promissory notes of the corporation, delivered by it to said bankrupts, and passed off by them, were outstanding to the amount of about $1,700,000, and, upon an adjustment of the books in which were kept the accounts between said corporation and said bankrupts, it was found that the balance was largely against the bankrupts and in favor of the corporation.

It appears that the corporation had constantly required in its business a large amount of raw sugars, and that the bankrupts, who were importers of sugars, had been in the habit of importing with the intention of selling the cargoes to the corporation.

At or about the time of the arrival of every such cargo so sold to the corporation it would be entered as a purchase on its books, and the bankrupts would at once receive credit therefor and get the promissory notes of the corporation for the sugars at an agreed price in currency, duty paid; the

gross amount being subsequently corrected by proper entries in the books, if the weight was found to be more or less upon actual delivery, and if the price of gold should have changed when the duties came to be actually paid. The cargoes were not actually delivered until required by the superintendent of the refinery for manufacture, and were generally, at the time the promissory notes were given, in the custody of the United States government, in its bonded store-houses, subject to its lien for the duties, and also still pledged to the bankers for their advances upon the letters of credit with which the bankrupts had purchased the sugars in Cuba.

The bankrupts, as the agents of the corporation, kept its books of account, and received all the money paid by its customers for the refined sugars sold to them. Upon an adjustment of the books of account it was found that up to the time of the failure the bankrupts had received in money and promissory notes amounts largely in excess of the sums credited to them for the sugars they had sold to the corporation; this excess, as the account was first made up, being about $655,-000. Subsequently it was found that five cargoes of sugar, which had been sold by the bankrupts to the corporation, and for which they had been credited, and for which they had received the notes of the corporation, could not be obtained. They had been pledged by the bankrupts to Alex. Brown & Sons, the bankers, for their full value. The amounts credited to the bankrupts for these five cargoes being deducted, and other corrections being made, the account was made up as now presented, and it is this account, now amounting to $1,027,794.94, which the trustees of the corporation are seeking to have allowed as a claim against the bankrupts' estate.

One item in this account is for the sum of about $64,000, paid by said trustees, being dividends amounting to $50\frac{1}{2}$ per cent. paid by them on a claim for about $127,000, proved by Alex. Brown & Sons against the estate of the corporation for guarantees by the corporation of letters of credit issued by the bankers to the bankrupts.

The assignee of the bankrupts has petitioned the court not

to allow this account for the amount claimed, because they insist that, as for the transactions covered by the account, the bankrupts received from the corporation its promissory notes, amounting to $1,716,000, which notes the corporation has not paid, and upon nearly all of which the bankrupts were liable as indorsers, and which have been proved as claims against the estate of said bankrupts. The trustees of the corporation should not be allowed to prove, for said amount claimed by them, beyond the amount of the dividends which has been paid on account of these notes out of the estate of the corporation.

Nearly all these promissory notes were indorsed by the bankrupts, and have been proved by the holders against their estate. Some of them, however, they did not indorse, but sold without recourse; and, as to others, they were pledged by the bankrupts as collateral security for loans made to them.

The trustees of the corporation, on the other hand, contend that as the bankrupts passed off for value, in one way or another, all these notes, *they operate as payment*, and so far as the account now to be adjusted between the corporation and the bankrupts is concerned they are to be treated as paid, because the bankrupts parted with them and got the proceeds of them, and the notes are now all out of their possession or control, in the hands of *bona fide* holders for value.

These facts have given rise to complications of rights and liabilities not easily settled, and both parties being insolvent, neither being able to perform their obligations or correct their mistakes, exact justice cannot be hoped for. All that remains possible is to endeavor to apply those rules and principles of law which have been established by decisions in similar cases.

One sound and well established rule applicable to the settlement of insolvent estates is that the estate must never pay two dividends in respect of the same claim. This rule was well illustrated and explained by the case cited in argument of the *Oriental Bank* v. *The European Bank*, reported in 7 L. R. (Chancery Appeals,) 99. In that case bills of exchange

drawn by one Constantinidi were accepted by the European Bank at the request of the Oriental Bank, and upon the undertaking of the Oriental Bank that it would provide funds to meet them at maturity. The bills were accepted by the European Bank under this arrangement, and, having been subsequently indorsed by the Oriental Bank, were discounted by the Agra Bank. Before the bills matured both the European and the Oriental Bank had stopped payment, and were being wound up by liquidators; the bills having been proved against both banks by the holder, the dividends received from both banks together just paid them in full, and the liquidators of the European Bank sought to prove against the estate of the Oriental Bank for the amount which it had been compelled to pay through its breach of the contract to provide funds to meet the bills at maturity.

In deciding the case Lord Justice Sir George Mellish, reversing the decision of Vice Chancellor Bacon, said: "It is quite obvious that if this proof is allowed the Oriental Bank will pay a double dividend on the same debt. It appears to me clearly that it is substantially the same debt, because, if all parties had been solvent, whatever sums the Oriental Bank might have paid to the Agra Bank, although they would have paid it, no doubt, for the purpose of performing the contract they had entered into by their indorsement, yet, substantially, whatever sums they might have paid to the Agra Bank would have gone in reduction of the sum which the Oriental Bank had promised to pay to the European Bank. In that case the Oriental Bank could never have been called upon to pay these bills twice over. It would have made no difference that they had entered into two contracts with two separate parties that they would pay the bills, namely, with the European Bank as acceptors, and with the Agra Bank as hol ers. It is clear that they would have performed both contracts by paying the bills once. * * * * It has been the law for a great number of years, with reference to proofs in bankruptcy, that if an acceptor accepts bills for the accommodation of the drawer, and the drawer enters into a contract,

express or implied, (and I do not think there is any difference between the two,) that he will provide for the bills when they become due, and then the drawer becomes bankrupt, there cannot be a double proof against his estate, namely, one proof by the holder of the bill, and the other proof by the acceptor of the bill on the contract of indemnity.  *  *  *  *  The principle itself—that an insolvent estate, whether wound up in chancery or in bankruptcy, ought not to pay two dividends in respect of the same debt—appears to me to be a perfectly sound principle.  If it were not so a creditor could always manage, by getting his debtor to enter into several distinct contracts with different people for the same debt, to obtain higher dividends than the other creditors, and perhaps get his debt paid in full.  I apprehend that is what the law does not allow; the true principle is that there shall only be one dividend in respect of what is in substance the same debt, although there may be two separate contracts." (pp.102-103.)

In the case now before me, from the course of dealing between the Calvert Sugar Refining Company and the bankrupts, it would appear that in advance of the delivery of the cargoes of sugars, and upon an estimate of their quantities, subject to correction when actually delivered, and subject to other adjustments of cost, the corporation was in the habit of handing over to the bankrupts its notes in round amounts, intended to be about equal to the price of the sugars.  It is obvious that this was done for the accommodation and convenience of the bankrupts, for the sugars were frequently not delivered until a considerable period afterwards, and were at the time still liable for the duties and under pledge to the bankers.  When it so happened that the bankrupts were unable to deliver the sugars, it would seem that the primary obligation resting upon them was to return all the promissory notes received by them for which they had not delivered sugars.  This they would not have been able to do, because they had passed the notes off and they were out of their possession and control.  It then, as it seems to me, became their duty to pay the notes when they matured, for the purpose of

relieving the corporation from all liability in respect to them. Practically, then, these notes, it seems to me, became of the nature of accommodation paper, as to which the bankrupts were first bound to see them paid, and as to which the corporation stood in the attitude of *sureties*.

*If the bankrupts had continued solvent and paid the notes,* the corporation would have had no claim against them except, perhaps, for a possible damage arising out of the increased price they might have have had to pay to replace the sugars; but no such element of damage is suggested as having actually occurred, so that by paying the notes the bankrupts would have satisfied the whole claim against them.

*If the corporation had continued solvent* after the bankrupts failed it would have had to pay their notes to the holders, and having paid them one of two courses would have been open to it. It could have proved a claim against the bankrupts' estate for the value of the undelivered sugars, or, if the notes are treated as accomodation paper, it could have proved the notes; but it could not do both. It could not possibly be allowed to prove against the bankrupts for both the value of the sugars and for the notes.

The corporation having failed before the maturity of the notes it did not pay them, and it does *not, itself,* prove them against the bankrupts, but the *holders* do; and to allow the claim now presented would, it appears to me, be allowing the same debt to be twice proved against the bankrupts, namely, once by the holders of the notes, and a second time by the corportiaon in their claim for the undelivered sugars.

With regard to the law applicable to this case it is further to be observed that if obligations are *proved in full* against the estate of the party primarily liable they cannot be proved again by the surety, even for the amount he or his estate has been obliged to pay. But if they are not proved in full, but before proof the amount received by the holder from the estate of the surety is first credited, then the surety is entitled to prove for the amount he has paid.

In this case the holders of all the notes, having received

from the trustees of the Calvert Sugar Refining Company dividends amounting to 50½ per cent., which are credited upon their claims, they will receive from the bankrupt estate dividends only upon the balance of their claims, and the letters of credit, upon which the trustees have paid similar dividends as guarantors, have not as yet been proved against the bankrupt estate at all.

It therefore appears to me that the trustees are entitled to prove for the sum of $64,398.52, which they have paid as guarantors upon the above mentioned letters of credit, and that upon an adjustment of the account between the corporation and the bankrupts the balance in favor of the corporation will represent the amount of promissory notes which the bankrupts availed themselves of in excess of the amount to which they were actually entitled, and which, in the view I have taken of the transaction, are to be regarded as of the nature of accommodation notes, and as to which, therefore, the corporation, standing in the attitude of surety, is entitled to prove for the amount actually paid by it; that is to say, for 50½ per cent. of the said balance.

This is the conclusion I have reached after a careful consideration of the facts and of the cases cited, aided by the very able arguments of counsel, and it has not seemed to me that it would subserve any useful purpose for me to attempt in mere detail to state the reasons why I have not been able to adopt as applicable to this case other principles of law which were forcibly argued and pressed upon the court, but in which I have been unable to find a satisfactory solution of the very great difficulties of the case.