## H. K. PORTER CO. v. BOYD.

## E. I. DUPONT CO. v. JOHN SHIELDS CONST. CO.

(Circuit Court of Appeals, Third Circuit.   March 3, 1909.)

### No. 26.

1. SALES (§ 202*)—TRANSFER OF TITLE AS BETWEEN PARTIES—WAIVER OF DEFAULT IN PAYMENT OF PRICE ON DELIVERY.

Where personal property sold, to be paid for on delivery in cash and notes, was delivered and held and used by the purchaser for five months before any settlement was made, during which time the seller was urging payment but at no time questioned the sale, the legal title as well as possession of the property passed to the purchaser, any right the seller may have had to reclaim it having been waived and lost by his failure to exercise it promptly on the purchaser's default.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 545; Dec. Dig. § 202.*]

2. BAILMENT (§ 8*)—ESTOPPEL TO DENY TITLE OF BAILOR.

While the principle of estoppel which precludes a tenant from disputing his landlord's title applies as well to leases or bailments for hire of personal property, it applies only in either case where the person sought to be estopped obtained possession of the property under and by virtue of the contract of lease or bailment, and no estoppel arises where he was already in possession when the contract was made and asserts ownership in himself prior to and independently of such contract.

[Ed. Note.—For other cases, see Bailment, Cent. Dig. § 32; Dec. Dig. § 8.*]

3. SALES (§ 456*)—CONDITIONAL SALE—DISTINGUISHED FROM LEASE.

Where personal property sold to be settled for on delivery was delivered without settlement, and retained and used by the purchaser until it became vested with the legal title, an instrument then executed between the parties, without change of possession, by which the seller purported to lease the property to the purchaser for three months in consideration of payments aggregating the amount of the original purchase price with interest, covenanting on such payments being made to execute a bill of sale of the property, and also that in case it retook the property on default it should sell the same and pay over any surplus proceeds to the lessee, was not in fact a lease, although so denominated and one in form, but in effect a contract of conditional sale, which was void because title had already passed.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1327–1331; Dec. Dig. § 456.*

What constitutes a contract of conditional sale, see note to Dunlop v. Mercer, 86 C. C. A. 448.]

4. CORPORATIONS (§ 560*)—RECEIVERS—TITLE OR RIGHTS ACQUIRED—SUCCESSION TO RIGHTS OF CREDITORS.

A receiver for an insolvent corporation, appointed at suit of general creditors, has the rights of an attaching or levying creditor as to property of the corporation of which he takes possession, and his possession defeats a secret lien on any of the property, which was purely equitable, although it may have been enforceable as between the parties, and especially where such lien was given to one who was at the time a general creditor, and to enforce it would give him an inequitable preference over other general creditors.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 560.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see E. I. Dupont Co. v. John Shields Const. Co., 162 Fed. 198.

R. W. Archbald, Jr., for appellant.

R. Stuart Smith, for appellee.

Before GRAY, Circuit Judge, and BRADFORD and LANNING, District Judges.

BRADFORD, District Judge. In December, 1905, the court of chancery of New Jersey, on a bill filed by certain stockholders and creditors of The John Shields Construction Company, hereinafter referred to as the construction company, a corporation of that state, on behalf of themselves and other creditors and stockholders of that company, appointed a receiver for it on the ground of insolvency. Subsequently ancillary proceedings were instituted in the circuit court of the United States for the eastern district of Pennsylvania, wherein Halsey M. Barrett was, December 30, 1905, appointed ancillary receiver of the construction company, and thereafter, certain vacancies by resignation having occurred in the ancillary receivership, William H. Boyd was, July 13, 1907, appointed such ancillary receiver. He duly qualified for the discharge of his official duties July 29, 1907. The appeal in this case was taken by the H. K. Porter Company, hereinafter referred to as the Porter company, a corporation of Pennsylvania, from a decree in the ancillary proceedings, denying the petition of that company for an order on the ancillary receiver of the construction company to pay to the former company $2,300, being a part of the agreed value of two locomotives hereinafter mentioned, sold by order of the court below. It appears from the record that in May, 1905, the Porter company contracted through its representatives and agents, Wonham & Magor, to sell two locomotives to the construction company and deliver the same to that company at Quarryville, Pennsylvania, for the price of $4,900, to be paid and secured as follows; one-third in cash on shipment, one-third in a note at sixty days, with interest at 6% added, and the remaining third in a note at ninety days, with interest at the same rate added. Pursuant to the above contract the Porter company duly delivered to the construction company at the stipulated place the locomotives, but the latter company wholly failed to perform its part of the contract; neither paying cash nor giving any note or notes on account of the purchase price. But such default did not prevent the property in the locomotives from passing from the Porter company to the construction company. The correspondence and transactions between the parties in May, 1905, constituted both in form and intention a contract of sale followed by delivery of the locomotives. Whether or not the sale could have been avoided for fraud is not a question before us. No fraud in the transaction is alleged against the construction company. Nor was any attempt made by the Porter company aside from procuring the execution of the written instrument of October 16, 1905, to disaffirm or to avoid the sale. There can be no doubt that the construction com-

pany in May, 1905, became the unconditional owner of the two locomotives and, notwithstanding its indebtedness for the purchase price, continued to be such owner until the execution of the written instrument above referred to; and during all that time and thereafter, and until the ancillary receiver of the construction company sold them by order of court, the possession of the locomotives continued in that company or its ancillary receiver. If the Porter company at any time had, by reason of mere failure on the part of the construction company to comply with the terms of payment, a right to reclaim the locomotives and avoid the sale, there was admittedly such delay by the Porter company as to constitute a waiver. The record does not disclose any conduct, act or declaration on the part of the Porter company or construction company prior to the latter part of September, 1905, by way of disaffirmance or inconsistent with an unconditional sale of the locomotives to and their ownership by the construction company. Indeed, the controlling weight of evidence negatives the existence of any intention on the part of either of the two companies before that time to disclaim, disaffirm or otherwise avoid the sale and terminate ownership by the construction company. No redelivery of the locomotives to the Porter company was made or requested. They remained in the possession of the construction company and its ancillary receiver until sold pursuant to the order of the court below. The Porter company repeatedly attempted to collect from the construction company the purchase price, but was unsuccessful. Thus the transaction prior to the correspondence and negotiations between the two companies in the latter part of September, culminating in the execution of the written instrument of October 16, 1905, presented the aspect of and was an absolute sale and delivery of the locomotives to and their ownership by the construction company, and an indebtedness of that company to the Porter company for the whole purchase price with interest. The above mentioned written instrument relates to the two locomotives in question, was executed under seal by and between the Porter company as party of the first part and the construction company as party of the second part, and its body, so far as material to consider in this connection, reads as follows:

"This Indenture, made this sixteenth day of October, A. D. 1905, between H. K. Porter Company, of Pittsburgh, Pennsylvania, party of the first part, and The John Shields Construction Co., party of the second part, Witnesseth, That the said party of the first part hath let, and by these presents doth let unto the said The John Shields Construction Co., party of the second part, two certain locomotive engines, * * * for the term of ninety days from date, and for the sum of five thousand ninety one dollars and fifty-one cents, to be paid in the following manner, to wit: Cash, to be paid at once, $1,000; The John Shields Construction Co.'s 60 days' note, dated October 16th, 1905—due December 15th, 1905, $2,040.70; The John Shields Construction Co.'s 90 days' note, dated October 16th, 1905—due January 14th, 1906, $2,050.81.

"And It Is Further Agreed, by and between the parties to these presents, that if default be made in the payment of the first, or any of the above named instalments or payments, or if said party of the second part shall undertake to dispose of said locomotive engines, or if the same shall be attached, levied upon, or taken by a third party, then it shall be lawful for, and the said party of the first part may re-enter into possession of said locomotive engines, so described as aforesaid, take away, repossess and enjoy

the same as though these presents were not made; but that the re-entry by said party of the first part and repossession of said engines, shall not operate as a payment of the indebtedness of the said party of the second part above contracted, nor discharge said party of the second part from liability for the same; but the said party of the first part shall have the right to dispose of said engines at public or private sale, in good faith without notice, and after payment of costs and expenses of said sale and of said retaking and the other expenses growing out of the default of said party of the second part, shall credit the net proceeds thereof upon the indebtedness of said party of the second part, and if the same shall not be sufficient to pay the full amount of said indebtedness, the said party of the second part shall be liable for, and will at once pay over the balance thereof. If there be any surplus, the same shall be paid over by the party of the second part. And the said party of the second part covenants and agrees that the said locomotive engines shall be taken to their railroad at Quarryville, in the State of Pennsylvania, and there kept and used, and not removed from the possession and control of the said party of the second part without the written consent of the party of the first part thereto first had and obtained; and at the expiration or sooner determining of the said term, he will quit and surrender the said locomotive engines in as good condition as reasonable wear and use will permit. And the said party of the first part hereby covenants and agrees that the said party of the second part, on paying the above specified instalments, and performing the covenants aforesaid, shall and may peaceably and quietly have, hold and enjoy the said locomotive engines, for the said term. And the said party of the first part hereby covenants, promises and agrees to and with the said party of the second part, that if the said party of the second part shall well and truly keep the covenants herein made, and shall pay the aforesaid instalments, as the same shall become due and payable, and if this lease shall not be determined sooner, by consent or otherwise, they, the said party of the first part, will make, execute and deliver to the said party of the second part, a good and sufficient Bill of Sale for said locomotive engines, the consideration whereof shall be the amount of the above named payments, received for the said term, making in all the sum of five thousand ninety one dollars and fifty-one cents."

The Porter company relies upon the above instrument to sustain its alleged right to recover from the ancillary receiver the $2,300 set apart by agreement to represent the two locomotives sold by him by order of court. Aside from the contract of October 16, 1905, the claim made by the Porter company would be wholly devoid of color. It is contended that the contract was a lease of the locomotives for a term of ninety days and under its provisions the lessor was, on the occurrence of any default therein specified on the part of the lessee, entitled to regain their possession; and, further, that the construction company as lessee was, and its ancillary receiver is, estopped from denying the title of the Porter company to the same. If it be assumed that circumstances might exist under which a contract in the form of the instrument in question could operate as a chattel lease and work an estoppel with respect to denial of title or ownership, such an assumption has no relevancy to this case. It does not necessarily follow from the fact that one is referred to as a lessee in an instrument to which he is a party, having the form and similitude of a lease, that he is precluded from questioning the right of ownership of the other party as to the property, real or personal, therein mentioned. Of course, if one gains possession only by means of and claims title solely under the instrument, he will, as a general rule, be estopped or precluded from disputing title with the other party to the contract during its continuance and until he shall have surrendered or redelivered the prop-

erty. But where he has otherwise gained possession, asserts ownership in himself, and neither claims nor defends under or by virtue of the instrument, there is no such estoppel. Chief Justice Marshall in Blight v. Rochester, 7 Wheat. 535, 547, 5 L. Ed. 516, said:

"The title of the lessee is, in fact, the title of the lessor; he comes in by virtue of it, holds by virtue of it, and rests upon it, to maintain and justify his possession. He professes to have no independent right in himself, and it is a part of the very essence of the contract under which he claims, that the paramount ownership of the lessor shall be acknowledged, during the continuance of the lease, and that possession shall be surrendered at its expiration. He cannot be allowed to controvert the title of the lessor, without disparaging his own, and he cannot set up the title of another, without violating that contract by which he obtained and holds possession; and breaking that faith which he has pledged, and the obligation of which is still continuing, and in full operation."

In Willison v. Watkins, 3 Pet. 43, 47, 7 L. Ed. 596, Mr. Justice Baldwin, in delivering the opinion of the court, said:

"It is an undoubted principle of law, fully recognized by this court, that a tenant cannot dispute the title of his landlord either by setting up a title in himself, or a third person, during the existence of the lease or tenancy. The principle of estoppel applies to the relation between them, and operates in its full force, to prevent the tenant from violating that contract by which he obtained and holds possession. Blight v. Rochester, 7 Wheat. 535 (5 L. Ed. 516). He cannot change the character of the tenure, by his own act merely, so as to enable himself to hold against his landlord, who reposes under the security of the tenancy, believing the possession of the tenant to be his own, held under his title, and ready to be surrendered on its termination by the lapse of time, or demand of possession."

It is unnecessary to multiply references to cases enunciating the principles declared in the above citations. They apply, we think, with equal force to leases of real estate and to leases or bailments for hire of personal chattels, and warrant an estoppel or preclusion as to title only where those relying on such estoppel or preclusion obtained possession of the subject-matter of the lease or bailment under and by virtue of it. In the case before us the construction company did not obtain possession of the locomotives under or by virtue of the instrument of October 16, 1905, or the negotiations leading up to it. At that time and since May, 1905, the possession of the property was held by the construction company under and pursuant to the sale in May, and during no portion of that time had the Porter company either its possession or ownership. That company having October 16, 1905, neither the possession nor the ownership of the locomotives, was then without power to execute a lease or bailment of them. Thus, even on the assumption that the instrument in question was in form a lease of the locomotives, there is no ground on which the doctrine of estoppel or preclusion as usually applicable in cases of lease, can here be recognized and enforced. Further, we are unable to adopt the view that the instrument of October 16, 1905, even aside from the fact that possession and ownership of the locomotives were then exclusively in the construction company, was or could have operated as a lease. While it is true that the instrument contains the words "hath let," "doth let," "term," "quit and surrender," "reasonable wear and use," and other phrases and expressions appropriate to and usually found in

leases, it is quite evident on a consideration of its provisions and the conditions existing at the time between the parties, that, whatever else was its nature, it was not a lease or bailment for hire. The sum of $5,-091.51 which, under the terms of the instrument of October 16, 1905, was to be paid by the construction company to the Porter company, is the amount which at that time the latter company was entitled to receive from the construction company in cash and notes bearing interest on the basis of an absolute sale of the locomotives to the construction company May 18, 1905. It was made up as follows:

```
Total amount specified in agreement of October 16, 1905...........  $5,091.51
Price of locomotives...................  $4,900.00
Difference in freight charges from
    Pittsburg to New York, and Pitts-
    burg to Quarryville, Pennsylvania...     19.68
                                        ---------- $4,919.68
Interest at 6% from May 18, 1905, to October
    16, 1905...............................................   121.35
                                                          ---------- $5,041.03
                                                                     =========
Cash "to be paid at once"...............................      $1,000.00
    Balance  ...............................  $4,041.03
                                              =========
One-half of balance (disregarding .03) included,
    aside from interest, in 60 day note...........   2,020.50
60 days' interest on note at 6%..................       20.20
                                                  ---------- 2,040.70
Remaining half of balance (disregarding .03) in-
    cluded, aside from interest, in 90 day note....   2,020.50
90 days' interest on note at 6%.................        30.31
                                                  ---------- 2,050.81
                                                            ---------- $5,091.51
```

Further, it is obvious from the written correspondence between the parties leading up to and culminating in the signing and sealing of the instrument of October 16, 1905, that the primary purpose of the parties by that instrument was, not to create a mere lease or bailment, but to secure payment of what was then due and owing to the Porter company by reason of the absolute sale of the locomotives May 18, 1905. And again, and pointing in the same direction, is the provision that if the construction company should keep the covenants and pay the instalments as the same should become due and payable, then, in the absence of an earlier termination of "this lease," the Porter company would make, execute and deliver to the construction company "a good and sufficient bill of sale for said locomotive engines, the consideration whereof shall be the amount of the above named payments, received for the said term, making in all the sum of five thousand ninety one dollars and fifty-one cents." It is unnecessary further to pursue the reasons which have led us to the conclusion that the instrument of October 16, 1905, could not in any aspect of the case operate as a lease or as a bailment. It certainly was not a chattel mortgage nor was it a pledge. Regarding the form of the instrument alone, we think that, if under any circumstances it could reserve or secure to the Porter company a legal in contradistinction to an equitable right, title or claim to the locomotives as against the construction company or its ancillary receiver, its operation would have been by way of condi-

tional sale. It is unnecessary to inquire whether the doctrine adopted by the Supreme Court of Pennsylvania touching conditional sales of chattels in its relation to the rights of creditors of the vendee is binding upon this court with respect to chattels there situated. No such question properly arises in this case. But, even were it assumed that such doctrine is not conclusive upon us, and that the principles laid down in Harkness v. Russell, 118 U. S. 663, 7 Sup. Ct. 51, 30 L. Ed. 285, are controlling, the Porter company could not derive any benefit from such an assumption. For, as both title to and possession of the locomotives were held absolutely and exclusively by the construction company under the sale in May, 1905, the Porter company October 16, 1905, had nothing, so far as the locomotives were concerned, to sell and consequently no right to regain possession by reason of any default on the part of the construction company. Under the circumstances the instrument of October 16, 1905, viewed as a contract of conditional sale, was simply a nullity. Nor is the ancillary receiver estopped or precluded from assuming this position, for he neither claims nor defends under that instrument, nor did the construction company or he get possession of the locomotives pursuant to it; but solely under and by virtue of the absolute sale in May, 1905.

It is nevertheless, in substance, further contended on the part of the Porter company that whatever may be the technical name of the instrument of October 16, 1905, it was a contract to the effect that "the construction company is to make certain payments * * * and if it does not do so, the Porter company may come and get the locomotives, and sell them for the construction company's account;" that forbearance by the Porter company to sue was a sufficient consideration to sustain the contract; and there being a sufficient consideration, "it can make no difference that the construction company then owned and had possession of the locomotives." We regard this contention, in view of the fact that no pledge was created, owing to non-delivery of the locomotives by the construction company to the Porter company, nor a chattel mortgage executed, as an attempt successfully to invoke the doctrine of equitable lien or charge on property arising from contract. It is true that, in the absence of delivery or recording, an equitable lien or charge may be created on personal chattels, by an agreement on sufficient consideration, that the property shall serve as security for a debt or other obligation, which lien or charge will be enforceable between the original parties and also against third persons who are mere volunteers or who take the property with notice of the agreement. Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865; Booz v. Philadelphia & L. Transp. Co. (C. C.) 124 Fed. 430. On the assumption that forbearance by the Porter company or its extension of the time for payment of the price of the locomotives was a sufficient consideration to support an agreement creating a lien on them to secure the payment of such price, such lien was purely equitable in contradistinction to legal. Any theory of the case which requires the Porter company to rely on the existence of such an equitable lien or charge is repugnant to the position taken by that company in its petition; for it there asserts ownership in itself, saying that by reason of the default

made by the construction company in the payments required by the agreement of October 16, 1905, "your petitioner was and is entitled to have, repossess and take away the said engines and that your petitioner's title thereto is good and effectual save as against subsequent purchasers for value or execution creditors." This is an allegation of legal ownership and does not harmonize with the theory of a purely equitable charge or lien as recognized in the cases last above cited and others to the same effect. But in view of the fact that such repugnancy might, other things being equal, be cured under the power of amendment so liberally exercised by the federal courts, we think it proper further to consider the case aside from such inconsistency. If, then, it be assumed that by virtue of the agreement of October 16, 1905, although entered into diverso intuitu, an equitable lien on the locomotives was created, good and enforceable as between the Porter company and the construction company, the question remains whether it can be enforced against the proceeds of their sale in the hands of the ancillary receiver. No citation of authority is requisite to support the proposition that such a secret lien could not avail against an attachment or execution creditor, not chargeable with knowledge or notice of its existence at the time of contracting his claim. It is equally clear that it is not necessary that it should appear that the creditor became such on the strength of the possession by the debtor of the property attached or levied on and the presumption of absolute ownership arising from such possession. As stated by Tilghman, Ch. J., in Martin v. Mathiot, 14 Serg. & R. (Pa.) 214, 16 Am. Dec. 491:

"A rule of law so restricted, would be of very little value. It rarely occurs that a man can prove, what it was that induced him to give credit. It is a rule of general policy, which declares possession to be the evidence of property, and the presumption is, that every man is trusted according to the property in his possession."

But it is contended that the ancillary receiver of the construction company does not represent its creditors, but only the company, and that they did not acquire by virtue of the receivership the rights of attaching or execution creditors. The extent of a receiver's power of representation depends upon the nature and purpose of the suit in which he is appointed and the scope of his authority as defined in the appointment, or, in the absence of a particular or precise definition, as implied from the fact of appointment considered in connection with the object sought to be obtained in the suit. The proceedings against the construction company both in New Jersey and in Pennsylvania were instituted by general creditors, were based on its insolvency, and contemplated the collection of its assets, their reduction into money and its distribution among the creditors, and, in case of a surplus, stockholders. The ancillary receiver here as well as the domiciliary receiver in New Jersey represents the corporation, its stockholders and its creditors, and holds possession of its assets within the eastern district of Pennsylvania under and by virtue of the authority and mandate of the court below, to the end that they may be disposed of under the order of that court, general or specific, in accordance with the principles of law and equity applicable. It is of no importance what

term may with most propriety be used to designate the taking and holding possession of the property of the construction company by the ancillary receiver. Whether it be called an equitable execution, an equitable attachment, a sequestration, or an impounding, is a matter of indifference. It does not affect the essential nature of the thing done. The receiver entered into and held possession by virtue of his appointment and the mandate of the court. A sheriff enters into and holds possession of property under an execution or attachment by virtue of his election or appointment and the order or writ of the court. In either case the property is compulsorily taken by judicial authority for the purpose of being applied to the payment of claims, theretofore or thereafter to be ascertained in nature or amount. In case of a receivership for an insolvent corporation procured at the instance of general creditors on the ground of insolvency, we are unable to perceive why a secret lien unenforceable at law should not be defeated by the seizure of the property by the "hand of the court" as effectually as by the making of an attachment or levying of an execution by a sheriff. The fact that the claims of many creditors may be involved in the former case and perchance only one in the latter does not differentiate the two. Plain justice requires that such a secret lien should be defeated in the former case; for not only does equity delight in equality, but the receivership bars creditors from pursuing the remedy, which otherwise would be open to them by way of attaching or levying on the personal chattels, to defeat the lien. We perceive no force in the suggestion that to allow the receiver to defend against the establishment of the asserted lien would be to permit him to take sides as between different creditors or classes of creditors. In such a case as the present, the rule of equity requires the pro rata division of the assets among the creditors, subject to the allowance of costs and expenses and the adjustment and liquidation of priorities and preferences. Equality or a pro rata distribution of the assets among the creditors being the most equitable result attainable, no liens or preferences should be recognized unless satisfactorily established; and it is not only proper, but it is incumbent on the receiver to protect the funds or assets in his hands against all attempts of creditors to defeat equality of distribution, through the assertion of secret liens to which they are not entitled as against the interests of the general and unsecured creditors. Such a lien might be recognized and satisfied in whole or in part out of the special fund subject to it as between the original parties, in so far as such fund might be included in a surplus of assets left after the payment of all costs and expenses and other debts and claims; but only in that improbable event. But it is unnecessary to pursue this particular inquiry. In Printing Press Co. v. Pub. Co., 213 Pa. 207, 62 Atl. 841, the Supreme Court of Pennsylvania held that where on a creditor's bill a receiver was appointed for an insolvent corporation he was not limited to the rights of such corporation as to chattels held by it under a conditional sale but had the rights of a levying creditor. Mitchell, Ch. J., delivering the opinion of the court, among other things, said:

"The authority of a receiver and the effect of his action depend almost entirely on the purpose of his appointment and the extent of his powers con-

ferred by the decree appointing him. * * * From this it must be assumed that the receiver in this case represented the creditors in whose interest he was appointed, and was clothed with all the powers that creditors would have had in acting for themselves. * * * A voluntary assignee for the benefit of creditors is a mere representative of the debtor and is bound where he would be bound: Wright v. Wigton, 84 Pa. 163; but Tams v. Bullitt (35 Pa. 308) establishes the distinction that when the assignee, trustee, or whatever he may be called, derives his authority, not from the mere voluntary act of the assignor, but from a mandate of the law, even when enforced in the language of that case, through a 'compulsory assignment' from the debtor, in the interest of the creditors, he represents the latter and is vested with their powers. The same principle applies a fortiori to a receiver deriving his authority not at all from the debtor, but altogether from the court acting in the interest and for the enforcement of the rights of creditors. When, therefore, on a creditor's bill, a receiver is appointed for an insolvent corporation, he is not limited like an assignee for the benefit of creditors, by the rights of the debtor corporation as to property held by it under a conditional sale, but has the rights of a levying creditor."

This decision fully accords with our views and confirms us, were confirmation needed, in holding that the ancillary receiver had the rights of an attaching or levying creditor and that consequently the secret lien was, as against creditors, defeated, leaving the Porter company to participate as a general creditor in the assets on terms of equality with the other general and unsecured creditors. Here there is even stronger ground than in Printing Press Co. v. Pub. Co., supra, for recognizing and enforcing the rights of the receiver as representing creditors; for, while in that case the title of the conditional vendor was both legal and equitable as against the vendee, here, on the assumption that there was a secret lien in favor of the Porter company, it was purely equitable and wholly unaccompanied by any legal title or right as against the construction company. There are many decisions not only by the lower courts but by the Supreme Court touching the rights of conditional vendors or lien holders as against trustees or receivers in bankruptcy. We deem it unnecessary to allude to such cases further than to say that they involved questions of statutory construction or interpretation under the bankruptcy legislation of the United States and have no pertinency to the matter now in hand.

But there is yet another ground on which the petition of the Porter company, whether amended or unamended, must fail. It is that, under the particular circumstances of the case, the assertion by that company of a preference or lien to secure the balance of the purchase price of the two locomotives is inequitable and unconscionable. By the absolute and unrescinded sale and delivery in May, 1905, the Porter company became only a general creditor of the construction company, occupying no better position than any third person who had become a creditor by selling and delivering personal chattels to the latter company on credit. It is true that by the instrument of October 16, 1905, the Porter company extended the time for the payment of a portion of the purchase price of the locomotives, and that this forbearance, for which it was to be remunerated at the satisfactory rate of six per cent. per annum on the deferred payments, may technically constitute a sufficient consideration for the agreement as between the two companies. But the Porter company suffered the loco-

motives to remain for months in the possession and use of the construction company without any attempt to retake them, thereby conferring on the latter company their ostensible ownership and creating and feeding a presumption of absolute and unencumbered dominion by that company. The least that could be expected of the Porter company would have been the recording of the agreement of October 16, 1905, or the securing and recording of a chattel mortgage at or before the execution of that agreement, to charge those dealing with the construction company with notice of the existence of a lien on the locomotives. But no chattel mortgage was at any time obtained nor was the agreement of October 16, 1905, recorded until after the appointment of the ancillary receiver. We think no court of equity should allow the Porter company after such negligence on its part, now to come in and by the assertion of a lien or preference prejudicially affect the pecuniary interests of those who became creditors of the construction company perchance through such omission by the former company to give notice to the public of the claim it now sets up. The decree of the court below should be and hereby is affirmed, with costs.