HITNER et al. v. DIAMOND STATE STEEL CO.

(Circuit Court, D. Delaware. February 26, 1910.)

No. 260.

*(Syllabus by the Court.)*

1. CORPORATIONS (§ 568*)—INSOLVENCY—PAYMENT OF CLAIMS.

One having a pecuniary claim ascertained in amount against an insolvent corporation in the hands of receivers, and holding collateral security for its payment, has a right in equity to receive out of its general assets pro rata dividends calculated on the basis of the amount of the corporate indebtedness to him existing at the time of the declaration of insolvency, including interest thereon, if any, to that time, without regard to such collateral security or any payment or payments he may have received on account of his claim since that time, provided, that he shall not receive and retain from any or all sources more than the real amount of his claim, with interest thereon until paid, aside from any costs, charges and expenses incurred by him in the enforcement of or realization upon such collateral security.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2288; Dec. Dig. § 568.*]

2. CORPORATIONS (§ 568*)—INSOLVENCY—RIGHTS OF SECURED CREDITOR.

One having a pecuniary claim ascertained in amount against an insolvent corporation in the hands of receivers, holding as collateral security for its payment bonds issued to him by it as such collateral, secured by a mortgage of a portion of its property executed by it, has no right in equity to receive out of its general assets pro rata dividends calculated on the basis of the aggregate amount not only of the corporate indebtedness to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

him existing at the time of the declaration of insolvency, including interest thereon, if any, to that time, but also of the face value of such bonds so far as unpaid at that time including the stipulated interest thereon.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2288; Dec. Dig. § 568.*]

**3.** CORPORATIONS (§ 568*) — INSOLVENCY — DISTRIBUTION OF ASSETS — UNPAID BALANCE.

There is a broad distinction between continuance in force of the contractual relations, notwithstanding insolvency, between lender and borrower where collaterals have been pledged, and ability to contravene the equitable rule of equality, subject to established liens, preferences and priorities, as between creditors with respect to general assets. It is a function of a suit in equity brought for the purpose of administering the affairs, paying the debts, and distributing the assets of an insolvent corporation, through or by means of a receivership, to effect a pro rata distribution of such assets among the creditors, subject to established liens, preferences and priorities, and a creditor, whether secured or unsecured, has obtained full satisfaction of his claim with respect to the general assets, so far as the particular proceedings in equity are concerned, when, aside from any lien, preference or priority held or possessed by him, he has received his full pro rata share of the general assets. If he has not received payment in full of the real indebtedness to him, the unpaid balance still constitutes a claim against the corporation which he may or may not succeed in collecting at some future time. It is as unsound to assume that he may receive from the general assets double dividends by reason and on account of two promises or obligations made for one and the same debt as it would be to assume that in a case of solvency the same creditor could receive double satisfaction by reason of a mere duplication of a promise or obligation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2288; Dec. Dig. § 568.*]

In Equity. Action by Henry A. Hitner and Joseph G. Hitner against The Diamond State Steel Company. Exceptions to report of special master. Exceptions sustained in part.

William Clarke Mason, for exceptant.
John Biggs, for claimants.

BRADFORD, District Judge. This case comes before the court on exceptions to the report of the special master. The Diamond State Steel Company was declared insolvent by this court December 12, 1901, and on the same day receivers were appointed who forthwith qualified and entered upon the discharge of their duties. The steel company then owned a manufacturing plant in Wilmington, including real and personal property, of which the larger part was subject to the lien of a mortgage executed by the company May 1, 1901, to secure an issue of bonds to be made, bearing the same date, of the face value of $1,000,000, and also a further issue of bonds of the face value of $750,000, to be made from time to time as should be authorized by the stockholders to secure working capital and extensions to the plant. All of the first mentioned amount of bonds were issued and outstanding either as collateral or in absolute ownership at the time of the declaration of insolvency and known as first mortgage bonds. The property covered by the mortgage has been sold free and discharged from the mortgage lien, the right being secured by order of this court to holders of bonds

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

issued under the mortgage to have recourse against the net proceeds of sale instead of the property mortgaged. Aside from such proceeds of sale there is a fund of general assets in the hands or subject to the control of the receivers applicable to claims against the steel company, whether secured or unsecured. Prior to the filing of the exceptions under consideration there was declared and paid out of the proceeds of sale of the mortgaged property a dividend of forty per cent upon the face value of the first mortgage bonds, and since that time an additional dividend of seven per cent upon such face value has been declared payable from the same source. The only dividend declared and payable out of the general assets, amounting to eight per cent upon the claims, secured and unsecured, against the steel company, was so declared and made payable since the filing of these exceptions. The holders of the first mortgage bonds thus have received or become entitled to dividends out of the proceeds of sale of the mortgaged property amounting to forty-seven per cent of their face value, and a dividend from the general assets amounting to eight per cent of such face value, aggregating fifty-five per cent; while creditors of the steel company, other than holders of its bonds, and not entitled to share in the proceeds of sale of the mortgaged property, and not having priority or preference of any kind, have received or become entitled to a dividend out of the general assets amounting to eight per cent only. The steel company executed and delivered to the Fourth Street National Bank of Philadelphia June 1, 1904, its promissory note dated that day for twenty thousand dollars, payable according to its terms September 1, 1904, in Philadelphia, delivering as collateral security for its payment certain first mortgage bonds of the steel company of the aggregate face value of nineteen thousand dollars, and certain consolidated mortgage bonds of the Lehigh and New England Railroad Company of the aggregate face value of $6,720. The note was in the following form:

"$20,000.00                                    Philadelphia, June 1st, 1904.

On September 1st, 1904, for Value Received, we promise to pay to the order of The Fourth Street National Bank, Philada. Twenty Thousand Dollars, having deposited as collateral security for payment of this or any other liability or liabilities to said holder hereof, due or to become due, or that may be hereafter contracted, the following property, viz:

$19,000.00 The Diamond State Steel Co. 1st mtge. 4% bonds
$6,720.00 L. & N. E. R. R. Co. 5% constd. mtge. bonds

with the right on the part of the holder hereof, to repledge the securities above mentioned, or to substitute or exchange for the same other certificates of like tenor and amount, and also from time to time to demand additional collateral security, and upon failure to comply with any such demand, this obligation shall forthwith become due, with full power and authority, to the holder hereof, or assigns, in case of such default, or of the non-payment of any of the liabilities above mentioned at maturity, to sell, assign and deliver the whole, or any part of such securities, or any substitutes therefor or additions thereto, at any broker's board, or at public or private sale, at their option, at any time or times thereafter, without advertisement or notice to the undersigned, and with the right on the part of the holder hereof, to become purchaser thereof at such sale or sales, freed and discharged of any equity of redemption. And after deducting all legal or other costs and expenses for collection, sale and delivery, to apply the residue of the proceeds of such sale or sales so made, to pay any, either or all of said liabilities, as said holder hereof shall deem proper, returning the overplus to the undersigned; and the undersigned will still remain liable for any amount so unpaid. It being further understood

and agreed that The Fourth Street National Bank of Philadelphia shall have a like lien upon any and all funds, stocks, bonds, notes, and other property at any time in the hands of the said Bank belonging to the maker, or endorser or endorsers, or guarantor or guarantors hereof, as security for this note and for any and all liability or liabilities, matured or unmatured, of such maker, endorser or endorsers, guarantor or guarantors to said Bank, which lien shall be enforceable in like manner and shall be subject to all the provisions herein above and before mentioned and set out.

Payable at The Fourth Street National Bank.

The Diamond State Steel Co.,
Frank W. Todd, Assistant Treasurer.
The Diamond State Steel Co.,
H. T. Wallace, President."

The bank presented to the special master a statement of claim, No. 49, sworn to October 10, 1905, referring to the above note as "constituting" its claim against the steel company and "the proceeds of any sale of its real or personal property," and setting forth in substance, among other things, that the steel company was at the time of the declaration of its insolvency and at the time of making claim indebted to the bank in the sum of $14,624, beside interest as therein stated, that sum being the excess of the $20,000 specified in the note over and above a credit of $5,376 representing proceeds of sale of the consolidated mortgage bonds of the Lehigh and New England Railroad Company, and further that the bank at the time of making claim held as collateral security for its payment first mortgage bonds of the steel company of the face value of $19,000. Subsequently the bank presented to the special master a further statement of claim, No. 209, sworn to February 15, 1906, setting forth in substance that it "is the holder of and owner of the legal title to" first mortgage bonds of the steel company of the aggregate face value of $19,000 on which interest was due to the bank from May 1, 1904; that the total amount due to the bank on the bonds was $19,000, with interest as above specified; and that the steel company at the time of the declaration of its insolvency and at the time of making claim was indebted to the bank in the sum of $19,000, with interest. The statement of claim further set forth as follows:

"This deponent, for and on behalf of the said The Fourth Street National Bank of Philadelphia, the said claimant, expressly and specifically claims that it, the said The Fourth Street National Bank of Philadelphia is entitled to be paid the said sum of nineteen thousand dollars ($19,000), with interest as aforesaid, as a preferred creditor under the lien of the said mortgage, out of any or all of the proceeds that may be derived from the sale of the property covered by said mortgage (claiming such preference, however, equally with and upon the same basis as other holders of said bonds so as aforsaid actually issued to the extent of one million dollars), and further expressly and specifically claims that it, the said The Fourth Street National Bank of Philadelphia is entitled to be paid the said sum of nineteen thousand dollars ($19,000), with interest as aforesaid, as a general creditor, out of the proceeds of the sale of all property of the said The Diamond State Steel Company other than the property covered by said mortgage; that nothing has been paid on account of the said claim of it, the said The Fourth Street National Bank of Philadelphia as a bondholder, and there are no offsets or counterclaims of any kind in favor of the said The Diamond State Steel Company to said claim or any part thereof."

It appears from their serial numbers and is not disputed that the first mortgage bonds of the face value of $19,000 delivered as collateral se-

curity for the payment of the $20,000 note were the same bonds on which the last mentioned claim was made by the bank. The special master after duly taking evidence allowed, with some modification as to interest, both claims as presented by the bank; and included the aggregate amount of $39,000, representing $20,000, the principal sum owing on the promissory note December 12, 1904, the date of the declaration of insolvency, and $19,000, the face value of the first mortgage bonds delivered as collateral, together with interest on these two sums to that date, in his ascertainment of the basis on which the bank should receive dividends out of the general assets of the steel company in so far as necessary to the payment in full of the real indebtedness of that company to the bank with interest thereon to the time of the declaration of insolvency. Accordingly, in the schedule of "general creditors" entitled to participate by way of dividends in the general assets, and for the purpose of payment in full as above mentioned, the bank was reported by the special master as a creditor of the steel company as follows: "49 & 209. Fourth Street National Bank of Philadelphia, $39,803.22," the sum of $803.22 representing interest on $20,-000 and $19,000 to the date of the declaration of insolvency. The Manufacturers' National Bank of Philadelphia also appears in the schedule of "general creditors" reported by the special master as a creditor in the sum of $16,453.36. This amount is made up of $4,158.70, representing the real indebtedness of the steel company to that bank existing at the date of the declaration of insolvency, including accrued interest, and $12,000, representing the face value of first mortgage bonds of the steel company delivered by it as collateral security for the payment of the debt and interest thereon, and $294.66 interest on such bonds to the date of the declaration of insolvency. Without entering into details it is sufficient to say that on the exceptions the same questions in principle are presented in the case of the Manufacturers' National Bank of Philadelphia as in that of The Fourth Street National Bank of Philadelphia, and that the decision of the one case will control the other. Both of these banks under and pursuant to the orders of this court and of the special master, for the purpose of sharing in the proceeds of sale of the mortgaged property, made proof before him of the first mortgage bonds of the steel company delivered to them respectively as collateral security as above mentioned; and in common with those holding and owning similar bonds appear in a separate schedule of bondholders reported by the special master; it appearing from the report that The Fourth Street National Bank of Philadelphia was entitled to receive dividends out of such proceeds of sale on the basis of the face value of bonds held by it as collateral, amounting in the aggregate to $19,000, with interest thereon from May 1, 1904, at the rate of four per centum per annum, as provided in the bonds and mortgage, and that the Manufacturers' National Bank of Philadelphia was entitled to participate in such proceeds of sale on the basis of the face value of the bonds held by it as collateral, aggregating $12,000, with interest thereon from the same date and at the same rate. It further appears that, aside from dividends out of the proceeds of sale of the mortgaged property, The Fourth Street National Bank of Philadelphia

has received since the declaration of insolvency on account of the indebtedness of the steel company to it $5,376, being the amount realized on certain consolidated mortgage bonds of the Lehigh and New England Railroad Company pledged by the steel company as collateral security; and that the Manufacturers' National Bank of Philadelphia held in addition to first mortgage bonds of the steel company of the face value of $12,000, pledged as above mentioned, claims and book accounts to a considerable amount assigned to it by that company as collateral security for the payment of the indebtedness, for which claims and book accounts, or their proceeds, the bank has not yet accounted to the receivers or special master. From the foregoing statement it thus appears that The Fourth Street National Bank of Philadelphia, having a claim against the steel company, including interest, at the time of the declaration of insolvency, of $20,336.67, and holding at that time as collateral first mortgage bonds of that company of the face value of $19,000, on which interest had then accrued to the amount of $466.55, and also certain consolidated mortgage bonds of the Lehigh and New England Railroad Company, has for the purpose of participation in dividends out of the general assets, declared or to be declared, been treated by the special master as a creditor in the aggregate amount of $39,803.22; notwithstanding the facts that since the declaration of insolvency the bank has received on account of its real claim $5,376 from the sale of the consolidated mortgage bonds, and has received also on account of its claim the further sum of $7,600, being a forty per cent dividend out of the proceeds of sale of the mortgaged property of the steel company, and since the filing of the exceptions this court has declared and authorized the payment to the holders of the first mortgage bonds of an additional dividend of seven per cent out of such proceeds of sale and a further dividend of eight per cent out of the general assets; and it further appears that the Manufacturers' National Bank of Philadelphia having a claim against the steel company, including interest, at the time of the declaration of insolvency of $4,158.70, and holding at that time as collateral first mortgage bonds of that company of the face value of $12,000 on which interest had then accrued amounting to $294.66, and also holding at and after that time certain claims and book accounts to a considerable amount assigned to it by that company as collateral, has for the purpose of participation in dividends out of the general assets, declared or to be declared, been treated by the special master as a creditor in the aggregate amount of $16,453.36, notwithstanding the facts that the bank has not yet accounted for such claims and book accounts or their proceeds to the receivers or special master, and has received on account of its real claim the sum of $4,800, being a forty per cent dividend out of proceeds of sale of the mortgaged property of the steel company, and since the filing of the exceptions this court has declared and authorized the payment to the holders of first mortgage bonds of an additional dividend of seven per cent out of such proceeds of sale, and a further dividend of eight per cent out of the general assets.

The exceptants have objected to the report of the special master so far as applicable to the two banks above mentioned; first, in that it

finds that they are entitled to dividends out of the general assets of the steel company, computed on the basis of the amount of their claims existing at the time of the declaration of insolvency without regard to the value of the collateral securities held by them at and after that time or the receipt after that time of any moneys realized from their sale or by way of dividends out of the general assets of the steel company or the proceeds of sale of the mortgaged property; and, secondly, that it finds that they are entitled to dividends out of the general assets computed on the basis of an aggregate amount representing not only the real indebtedness of the steel company to them respectively existing at the time of the declaration of insolvency, with interest to that date, but also the face value of the first mortgage bonds of the steel company held by them respectively as collateral including the stipulated interest thereon. The two questions thus raised may be stated generally as follows:

First: Whether one having a pecuniary claim ascertained in amount against an insolvent corporation in the hands of receivers, and holding collateral security for its payment, has a right in equity to receive out of its general assets pro rata dividends calculated on the basis of the amount of the corporate indebtedness to him existing at the time of the declaration of insolvency, including interest thereon, if any, to that time, without regard to such collateral security or any payment or payments he may have received on account of his claim since that time, provided, that he shall not receive and retain from any or all sources more than the real amount of his claim, with interest thereon until paid, aside from any costs, charges and expenses incurred by him in the enforcement of or realization upon such collateral security.

Second: Whether one having a pecuniary claim ascertained in amount against an insolvent corporation in the hands of receivers, holding as collateral security for its payment bonds issued to him by it as such collateral, secured by a mortgage of a portion of its property executed by it, has a right in equity to receive out of its general assets pro rata dividends calculated on the basis of the aggregate amount not only of the corporate indebtedness to him existing at the time of the declaration of insolvency, including interest thereon, if any, to that time, but also of the face value of such bonds so far as unpaid at that time including the stipulated interest thereon, provided, that he shall not receive and retain from any or all sources more than the real amount of his claim, with interest thereon until paid, aside from any costs, charges and expenses incurred by him in the enforcement of or realization upon such collateral security.

Whatever might be the inclination of this court on the subject were it res integra, the first of these two questions has been set at rest by the Supreme Court in Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640; the court there fully recognizing and approving the following as the chancery rule:

"The creditor can prove for, and receive dividends upon, the full amount of his claim, regardless of any sums received from his collateral after the transfer of the assets from the debtor in insolvency, provided that he shall not receive more than the full amount due him."

I can perceive no force in, and it is unnecessary to discuss. the contention that the bankruptcy rule, and not the chancery rule, is applicable to this case by reason of certain unsuccessful attempts to have the steel company adjudged a bankrupt, or of the refusal by the district court to allow certain proposed amendments of the petitions in bankruptcy. The administration of the assets is on the equity side of this court and the chancery rule necessarily must apply. The first ground of exception must, therefore, be overruled.

Materially different considerations, however, enter into the solution of the latter of the above questions. It is true that each of the two banks had a right to receive dividends from the general assets of the steel company computed upon the amount of its real claim, including interest, as existing at the time of the declaration of insolvency, and also to proceed for the enforcement of any collateral security for such claim until payment in full of the real indebtedness, with interest to the time of payment, as against third persons liable thereon or any mortgaged or pledged property included in such collateral security. But had either of the banks for the purpose of obtaining full satisfaction of its claim a right to receive dividends out of the general assets computed, not only upon the amount of its real claim, but also upon the amount of the face value of the first mortgage bonds of the steel company held by it as collateral security? Undoubtedly the banks were entitled to the full benefit of the collaterals held by them; but how far can the first mortgage bonds so held, aside from the property mortgaged to secure their payment, legitimately be held to constitute collateral security, and as such to enlarge beyond the amount of the real indebtedness the basis for the computation of dividends out of the general assets? These queries bear no necessary relation to the legality or propriety of a resort, under special circumstances, by one holding mortgage bonds of a corporation issued directly to him as collateral security for the payment of a debt owing by it to him, for the purpose of sharing in the general corporate assets, to such bonds as an alternative or cumulative medium of proof of his right to participate in such assets upon the basis of the real indebtedness. Owing to lapse of time or difficulty otherwise arising it may in certain cases be impracticable effectually to proceed upon the original security or evidence of indebtedness for the purpose of receiving pro rata dividends upon a just demand, and it may well be that the creditor in such a predicament will be allowed for that purpose to establish or strengthen his claim to its real amount through the superior efficacy or evidential value of the bonds held as collateral. But with such special circumstances this court has nothing to do in the case under consideration. The real question here is whether a creditor holding such bonds so issued to him as collateral can through their instrumentality entitle himself to receive out of the general assets dividends computed upon a basis larger than the amount of the actual indebtedness to him, including interest, existing at the time of the declaration of insolvency. The proper solution of this question is simplified by a consideration of one of the essential elements of collateral security in the legitimate sense of the phrase. Such security necessarily involves more than the mere personal responsibility of the debtor. It

hardly admits of discussion that the mere duplication or multiplication of a promise to pay or of an acknowledgment of liability to pay a cer-. tain sum representing the total real indebtedness to a creditor, whatever may be its effect in furnishing in certain exigencies alternative . or cumulative evidence of the real demand, cannot constitute collateral security. If A. makes and delivers to B. his promissory note for $1,000, representing. the full amount of his real indebtedness to the latter, and contemporaneously or thereafter and without any new or further consideration or the intervention of any third person as joint maker, indorser, surety or guarantor, makes and delivers to B. another promissory note in the same amount, unaccompanied by any mortgage or pledge of or charge or lien upon property, or by any assignment or transfer of any chose in action against a third person, calling it "collateral security," such designation of name will not change the nature of the transaction. Notwithstanding the giving of the two notes the real indebtedness still remains at the sum of $1,000, secured only by personal responsibility on the part of the debtor, which per se is not collateral security. Jones in his work on Pledges and Collateral Securities, § 1, speaking of this phrase, says:

"The term necessarily implies the transfer to the creditor of an interest in, or lien on property, or an obligation which furnishes a security in addition to the responsibility of the debtor; therefore the execution and delivery by the debtor of additional unsecured evidences of his own indebtedness, does not in any legal sense constitute collateral security."

In Colebrooke on Collateral Securities, § 2, it is stated:

"'Collateral security' is a separate obligation, as the negotiable bill of exchange or promissory note of a third person, or document of title, or other representative of value, indorsed (or assigned) where necessary, and delivered by a debtor to his creditor, to secure the performance of his own obligation, represented by an independent instrument. Such collateral security stands by the side of the principal promise as an additional or cumulative means for securing payment of the debt. The transfer, however, of the debtor's own negotiable promissory notes as collateral security for the payment of other notes made by him, does not come within any definition of collateral security."

If A., in the case above supposed, having the ability, should· fully pay to B. the amount of the first note, namely, $1,000, the extent of the real indebtedness, the latter having received satisfaction in full could have no occasion and would not be permitted to collect from A. any further sum; and if A. were unable to pay to B. the amount of the first note, representing the extent of the real indebtedness, he, of course, would be unable to pay the aggregate amount of the two notes. Thus, in the absence of any indebtedness or pecuniary liability of A. to third persons, neither note, whatever name may be applied to it, could perform the function of collateral security for the payment of the other or of the real indebtedness whatever use might be made of it as evidence to establish such indebtedness. The characterization of either or both of the notes by the maker as "collateral security" would be unavailing. The case would not in equity be varied in principle or result if A. were a corporation and not a natural person and, instead of making and delivering promissory notes, directly issued two of its own bonds each for $1,000 unaccompanied by any pledge, mortgage or other lien, to

secure the payment of its real indebtedness of $1,000 to B. The substitution of the mere personal responsibility of the artificial entity for that of the natural person could not in any manner, in the absence of indebtedness or pecuniary liability to third persons, differentiate the one case from the other. Now, let it be assumed that A., the corporation, is indebted or under pecuniary liability to third persons. If the corporation be insolvent, with numerous creditors, secured and unsecured, and in the hands of receivers appointed by a court of equity in proceedings instituted for the purpose of winding up its affairs and distributing its assets, on what principle can its two $1,000 unsecured bonds, or either of them, while in the hands of B. to whom they were directly issued as "collateral security" for the payment of the real indebtedness of $1,000, entitle him, for the purpose of fully satisfying it, to receive out of the general corporate assets dividends computed upon the face value of such bonds or bond in addition to dividends computed upon the amount of the real indebtedness? B. could not be so entitled in the case supposed unless the issue of the unsecured bonds to him operated to enlarge his claim against the corporation beyond the amount of its real indebtedness to him or to create a lien or charge against the general assets to the amount of pro rata dividends computed upon the face value of such bonds. The mere issue to him of such bonds as "collateral security" could not effect such enlargement of claim absolutely; for beyond dispute and admittedly the receipt by B. of $1,000, the amount of the real indebtedness, would fully satisfy all claim on his part against the corporation. But it is in substance contended that such issue of bonds to him would effect an enlargement sub modo of his claim beyond the real indebtedness to him and up to the aggregate amount of such indebtedness and the face value of the bonds, namely, $3,000, for the purpose of enabling him to receive if possible payment in full of the $1,000 debt actually owing; and it is argued that such must be the case, as the two $1,000 bonds issued to B. were valid instruments, and the corporation in issuing them must have intended that he should have the full benefit of them as "collateral security," and, not being secured by any pledge, mortgage or other lien, the only conceivable substantial benefit he could derive from them would be the enjoyment of dividends out of the general corporate assets computed upon their face value. But the validity of the bonds issued to B. is not determinative of the question. On the assumption that those bonds are valid and, being of a negotiable nature, would on their transfer for value to a third person confer upon the latter a right, as their absolute owner and, as such, an unconditional creditor of the corporation, to participate with its other unsecured creditors in the pro rata distribution of the general assets, the fact yet remains that the bonds in the hands of B. do not constitute an absolute unconditional indebtedness or liability of the corporation to him, and, not being secured by pledge, mortgage or other lien, though called "collateral security," are not such save in the sense of providing him with alternative or cumulative evidence in support of his real demand. Further, the corporation is chargeable with knowledge of the law, and, therefore, its intention that B. should have the full benefit of the bonds issued to him as "collateral security," though unsecured by pledge, mortgage or other

lien, must in the absence of evidence showing an understanding to the contrary be regarded as an intention merely that those bonds should serve as occasion might require as an alternative or cumulative medium of proof of the actual indebtedness; but not that B.'s claim should be multiplied or enlarged beyond the actual indebtedness of the corporation to him. Nor in the case supposed could the issue to him of the unsecured bonds operate to create a lien or charge against the general assets of the corporation to the amount of pro rata dividends computed upon the face value of such bonds. The creditors of an insolvent corporation are in equity, and in subordination to valid liens, priorities and preferences, severally the owners of its general assets in proportion to the respective amounts of the real indebtedness of the corporation to them respectively. The maxim that equity delights in equality has full application to creditors of an insolvent corporation; and as equality among creditors or a pro rata distribution of the assets among them is, generally speaking, the most equitable result obtainable, no liens or preferences should be recognized unless satisfactorily established. Equality is the rule; liens, preferences and priorities, the exception. If in the supposed case the issue to B. of the unsecured bonds as "collateral security" could create a lien or charge upon the general assets for the whole or any part of the real indebtedness of the corporation to him, such lien or charge would necessarily grow out of some contract on the part of the corporation implied from the fact of the issue to him of such bonds. But certainly no such lien or charge could arise by implication as against other creditors, without notice, entitled to share in the general assets; for as against such creditors, there being no delivery, actual or constructive, by way of pledge or setting apart or segregation of any portion of the general assets to answer the purposes of collateral security, such lien or charge could not be created by mere personal contract even though express. An equitable lien or charge may be created on property, real or personal, without recording or delivery, enforceable between the original parties and also against third persons who are mere volunteers or purchasers with notice, by an agreement on sufficient consideration that the property shall serve as security for a debt or other obligation. Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865. Booz v. Philadelphia & L. Transp. Co. (C. C.) 124 Fed. 430. In the case supposed, even if there were an express agreement between the corporation and B. that the delivery to him of the unsecured bonds as "collateral security" should confer upon him a lien or charge upon the general assets by way of security for the payment of the whole or any part of the actual indebtedness to him, such agreement contemplating an essentially secret lien, would be unavailing as against other creditors entitled to share in such assets, and would be defeated by receivership proceedings instituted for the purpose of winding up the affairs and distributing the corporate assets. In H. K. Porter Co. v. Boyd, 171 Fed. 305, 96 C. C. A. 197, it was held that a receiver of an insolvent corporation appointed in proceedings having such a purpose has the rights of an attaching or levying creditor as to corporate property of which he takes possession, and that his possession defeats a secret lien on any of the property which

was purely equitable, although it may have been enforceable as between the parties. The court, among other things, said:

"It is of no importance what term may with most propriety be used to designate the taking and holding possession of the property of the construction company by the ancillary receiver. Whether it be called an equitable execution, an equitable attachment, a sequestration, or an impounding, is a matter of indifference. It does not affect the essential nature of the thing done. The receiver entered into and held possession by virtue of his appointment and the mandate of the court. A sheriff enters into and holds possession of property under an execution or attachment by virtue of his election or appointment and the order or writ of the court. In either case the property is compulsorily taken by judicial authority for the purpose of being applied to the payment of claims, theretofore or thereafter to be ascertained in nature or amount. In case of a receivership for an insolvent corporation procured at the instance of general creditors on the ground of insolvency, we are unable to perceive why a secret lien unenforceable at law should not be defeated by the seizure of the property by the 'hand of the court' as effectually as by the making of an attachment or levying of an execution by a sheriff. The fact that the claims of many creditors may be involved in the former case and perchance only one in the latter does not differentiate the two. Plain justice requires that such a secret lien should be defeated in the former case; for not only does equity delight in equality, but the receivership bars creditors from pursuing the remedy, which otherwise would be open to them by way of attaching or levying on the personal chattels to defeat the lien. We perceive no force in the suggestion that to allow the receiver to defend against the establishment of the asserted lien would be to permit him to take sides as between different creditors or classes of creditors. In such a case as the present, the rule of equity requires the pro rata division of the assets among the creditors, subject to the allowance of costs and expenses and the adjustment and liquidation of priorities and preferences. Equality or a pro rata distribution of the assets among the creditors being the most equitable result attainable, no liens or preferences should be recognized unless satisfactorily established; and it is not only proper, but it is incumbent on the receiver to protect the funds or assets in his hands against all attempts of creditors to defeat equality of distribution, through the assertion of secret liens to which they are not entitled, as against the interests of the general and unsecured creditors."

Thus, if there had been in the case supposed an express agreement for a lien, charge or preference against the general corporate assets, based upon the issue to B. of the unsecured bonds as "collateral security," it would have been unavailing as against other creditors, without notice, entitled to share in such assets. Were this not true the door would be opened wide to gross inequality among and constructive fraud upon creditors. If the corporation for the purpose of securing the payment of its actual indebtedness to B. could by a secret agreement with him create a lien, charge or preference in his favor against the general assets, valid as against creditors, based upon one of its unsecured bonds issued to him as "collateral security," it could equally create a valid lien, charge or preference of the same kind based upon ten or one hundred similar bonds, thereby insuring the payment in full of the indebtedness to B., to the detriment of other creditors and in defiance and nullification of the fundamental rule of equality as between creditors. Nor would knowledge or notice on the part of some only of the creditors at the time they gave credit to the corporation of such agreement for a lien, charge or preference be material. The receiver represents not only creditors who may have had, but also creditors who did not have, such knowledge or notice; but it would be utterly impracticable in the computation of dividends to be paid out of the gen-

eral corporate assets to establish one basis of adjustment for dividends coming to those who had such knowledge or notice, and another for those who had not. The futility of any attempt so to distinguish and the uncertainty and confusion which would be introduced into the ascertainment of the shares to be received by creditors from such assets are palpable. And an arithmetical increase in the number of such agreements for liens, charges or preferences against the general assets could only result, if attempt were made to treat creditors who had such knowledge or notice differently from those who had not, in a geometrical increase in such uncertainty and confusion, rendering impossible any systematic or orderly administration of such assets. It is necessary, therefore, that the same basis of computation of shares or dividends out of the general assets should be applicable both to those creditors who had and those who had not such knowledge or notice, and further, from a consideration of the balance of the equities involved, that such basis should be that which is proper in the absence of any such knowledge or notice on the part of other creditors entitled to share in the general assets. For clearly it is more equitable that creditors entitled to share in the general assets and wholly ignorant of any agreement for a lien, charge or preference against the same should be protected against any diminution in their shares through an allowance of such lien, charge or preference, than that a creditor, claiming such lien, charge or preference should in contravention of the broad and salutary equitable policy of equality among creditors with respect to general assets, be permitted to enforce such an agreement even as against those creditors who had knowledge or notice thereof. The doctrine of equitable lien or charge on property without recording or delivery, arising by agreement on sufficient consideration and enforceable against not only the original parties but volunteers or purchasers with notice, recognized in the cases last above cited, can have no legitimate application in the administration of the general assets of an insolvent corporation in the hands of receivers. If, then, in the absence of delivery, actual or constructive, by way of pledge or of any setting apart or segregation of any portion of the general assets, an express contract for a lien, charge or preference against the same would be unenforceable and invalid, no such lien, charge or preference could arise in the case supposed by a mere delivery to B. of the unsecured bonds as "collateral security." The law will not imply a lien based upon the supposed intention of the parties where the law will not permit the parties by express contract to create such lien. As in the case supposed there was no express contract that B. should have a lien, charge or preference against the general assets, so in the case now to be determined there was no express contract that either of the two banks should have such lien, charge or preference. It was admitted on the part of the banks at the hearing that the mere duplication or multiplication of an unsecured note or bond for a debt does not involve the giving of collateral security in any legitimate sense or serve to enlarge the basis for the computation of dividends in case of insolvency. But it was claimed that if a bond delivered as collateral is secured to any extent, however slight, by a mortgage or pledge of property the bond becomes

"real collateral security," and as such will enlarge the basis for dividends out of the general assets, not covered by such mortgage or pledge. The fact that the steel company executed a mortgage to secure its issue of bonds does not in principle differentiate this from the supposed case so far as the question of the right to resort to the general corporate assets is concerned. The bonds delivered to the banks were undoubtedly collateral security in the legitimate sense of the phrase to the extent to which the proceeds of the mortgaged property were applicable to those bonds, but only to that extent. For only so far did they involve "the transfer to the creditor of an interest in, or lien on property, or an obligation which furnishes a security in addition to the responsibility of the debtor." The bonds as collateral security attached to such proceeds, but whatever may or might be their function as an alternative or cumulative means of establishing the real indebtedness of the steel company to the banks at the time of the declaration of insolvency, they could not serve in any manner to enlarge beyond the amount of such actual indebtedness the basis for the computation of dividends from the general assets. To assume that the mere fact of the execution of a mortgage to secure an issue of bonds would, regardless of the value of the property covered by it, entitle one holding some of them purely as collateral security to receive dividends out of the general assets computed upon both the full amount of his actual claim and the face value of the bonds so held is, in my judgment, to suppose an absurdity. The touch of a magician's wand would be required to impart such potency to the execution of the mortgage and the consequent securing of the payment of some small proportion of the face value of the bond, as to convert such total face value into an additional personal liability of the corporation entering by way of enlargement into the determination of the basis for the computation of dividends from the general assets. That one holding a $1,000 bond directly issued and delivered to him by a corporation as collateral security, belonging to a series of bonds secured by a mortgage executed by the corporation, should be allowed to enlarge the basis for the computation of dividends payable to him out of the general assets by adding to the amount of the actual indebtedness to him the whole face value of the bond, where the mortgaged property is sufficient to pay only one per cent of such face value, while one holding a $1,000 bond so issued and delivered to him as "collateral security" not accompanied or secured by any pledge, mortgage or other lien upon the corporate property, but representing only the personal responsibility of the corporate entity, should not be permitted to use such bond to enlarge in any manner whatsoever beyond the actual indebtedness the basis upon which he should receive dividends, is a proposition unworthy of serious consideration. It was suggested rather than seriously argued that the recording of the mortgage of the steel company was notice to the world of the one million dollar issue of bonds, and, therefore, that allowing one holding such bonds as collateral to participate on the basis of their face value, not only in the proceeds of the mortgaged property, but in the general assets by way of dividends, regardless of the receipt of dividends on the real indebtedness, would work no injustice or hardship upon unsecured creditors, as they were chargeable in law at the

time of dealing with the steel company with knowledge of the existence of such bonds. This suggestion is without weight for several reasons of which it will be sufficient to mention only one. While notice to unsecured creditors of the amount of the first mortgage bonds outstanding at any given time would not affect the decision of the questions involved in this case, it is to be observed that the mortgage was executed to secure bonds not then issued, but only thereafter to be issued, and hence knowledge of the existence of the mortgage could not possibly serve as notice of the number or aggregate face value of bonds outstanding whether as collateral or in absolute ownership at any given time. It was argued that if the banks could sell and transfer the first mortgage bonds held by them as collateral to a third person, conferring upon the purchaser a right to participate not only in the proceeds of the mortgaged property, but in the general assets, the banks themselves without such sale and transfer would have the same right to participate in both funds. But this is a fallacy. The bonds in the hands of the purchaser would represent unconditional indebtedness of the steel company and liability to pay its amount, whether they were purchased for more or less than their face value. But while remaining in the possession of the banks purely as collateral security they do not as between the steel company and the banks represent such an indebtedness. It was further contended that if the banks for the purpose of realizing on their collateral had exposed the first mortgage bonds for sale and become bona fide purchasers, they could, equally with a third person purchasing the same, have resorted to both funds. This is true, subject to the qualification that the net purchase price would operate as a payment on account of the original indebtedness for which the bonds had been delivered as collateral. Upon such purchase the bonds would ipso facto cease to be held by the banks as collateral, and would represent actual unconditional indebtedness and liability on the part of the steel company; the consideration for the change being the part payment of the original indebtedness resulting from the purchase of the bonds by the banks, such part payment, other things being equal, increasing the chance of payment in full of the original indebtedness through the application of dividends from the general assets. Both of these considerations are aside from the merits of the case before the court; for neither of them presents a case of double dividends from the general assets upon the same indebtedness or of enlarging the basis for the computation of dividends out of such assets beyond the amount of the real indebtedness of the steel company to the banks. It was further suggested on the part of the banks that if they had after the declaration of insolvency sold the first mortgage bonds held by them as collateral the purchaser would have been entitled to receive dividends from the general assets; that the banks also would have received dividends from such assets computed upon the basis of the full amount of the original indebtedness of the steel company to them regardless of the receipt by them of the purchase money for the bonds; and that, therefore, the allowance to them of dividends out of the general assets computed on both the face value of the bonds held by them as collateral and the amount of the real in-

debtedness of the steel company to them would not be prejudicial to the rights of unsecured creditors. With respect to this suggestion it may be observed, first, that the case it assumes is different from that before this court, and, secondly, that the only practical deduction to be made from it is that the banks might commit a fraud in receiving not only the purchase money for the bonds but dividends on the original indebtedness of the steel company to them to such an extent as to work an overpayment of their real claims. If the supposed case does not mean this it has no significance; for the banks beyond question would, short of overpayment of their claims, have a right to receive dividends computed upon their full amount without regard to the proceeds of the collateral sold by them. Fraud is not to be presumed but strictly proved. But if there are circumstances raising doubt whether the receipt of a dividend out of the general assets by a creditor who is known or supposed to have received collateral security would not work an overpayment of his original claim, the court having the administration of the assets has full power to investigate the matter and do justice in the premises. It is contended that the contractual relations between lender and borrower, where collaterals have been pledged, remain "unchanged although insolvency has brought the general estate of the debtor within the jurisdiction of a court of equity for administration and settlement," and hence it is argued that each of the banks is entitled for the purpose of obtaining satisfaction in full to receive dividends out of the general assets of the steel company computed upon the basis of the aggregate amount of the real indebtedness to it, and also the face value of the bonds delivered as collateral security for such indebtedness. The difficulty here is not with the premise, but the conclusion. The fallacy arises from failure to distinguish between continuance in force of the contractual relations notwithstanding insolvency, and ability to contravene the equitable rule of equality, subject to established liens, preferences and priorities, as between creditors with respect to general assets. It is not the function of a suit in equity brought for the purpose of administering the affairs, paying the debts and distributing the assets of an insolvent corporation, through or by means of a receivership, to extinguish without full satisfaction the claims of creditors, secured or unsecured; but it is the function of such a suit to effect a pro rata distribution of the corporate assets among the creditors, subject to established liens, preferences and priorities, and when a creditor has received his full proportionate share of the general assets he has obtained satisfaction of his claim so far as in the very nature of the case it can in those proceedings be satisfied out of such assets. If a creditor, whether secured or unsecured, has not received payment in full of the real indebtedness to him, the unpaid balance still constitutes a claim against the corporation which he may or may not succeed in collecting at some future time. But he has obtained full satisfaction of his claim with respect to the general assets so far as the particular proceedings in equity are concerned, when, aside from any lien, preference or priority held or possessed by him, he has received his full pro rata share of the general assets. It is as unsound, unreasonable and inequitable to assume that in the case of insolvency a creditor may receive from the general assets double divi-

dends by reason and on account of two promises or obligations made for one and the same debt, as it would be to contend that in a case of solvency the same creditor could receive double satisfaction by reason of a mere duplication of a promise or obligation. This conclusion, far from militating against the sanctity of contractual relations between lender and borrower by reason of the occurrence of insolvency, accords them full recognition and enforces them as far as possible under conditions existing at the time.

The case of the banks cannot be distinguished in principle from that of B. to whom A. has made and delivered a promissory note for $1,000, the amount of his real indebtedness, and has indorsed and delivered by way of collateral security a promissory note made by C. to the order of A. Responsibility or an obligation on the part of a third person equally with a pledge or lien upon property, real or personal, may constitute collateral security. In the case supposed the latter note is in the hands of B. collateral security inasmuch as it represents an obligation on the part of C. which furnishes a security to B. in addition to the responsibility of A. The promise, however, of A. implied from his indorsement of C.'s note is not collateral security but merely a promise, additional to that contained in the note made by him, to pay the whole or a part of the real claim of B., and cannot enlarge beyond the amount of the real indebtedness the basis for the computation of dividends from A.'s insolvent estate. But the additional promise of A. arising from his indorsement of the second note to B. can be treated as collateral in so far and only in so far as necessary to obtain the benefit of C.'s promise or obligation.

There are many judicial decisions and dicta from which a deduction fairly can be made to the effect that the banks are entitled to share in the general assets of the steel company only on the basis of the amount of the actual corporate indebtedness to them at the time of the declaration of insolvency, including in such basis interest, if any, to that time. In Third National Bank v. Eastern Railroad, 122 Mass. 240, the court held that a creditor of a railroad company who held its promissory note and, as collateral security for the same, three other notes of the corporation, with coupons attached, could prove only to the amount of the original note against the corporation, the coupons not being accompanied by any charge or lien upon the property. The court said:

"The coupon notes in question cannot, in the original creditor's hands, be regarded as existing debts and liabilities within the meaning of the act or as securities which can be availed of by the creditor so as to give him any advantage over others. A debtor's liability to his creditor, where other creditors are concerned, is not increased by increasing the number of his promises to pay the same debt, in whatever form he may make them. To hold otherwise would be to enable the debtor to incumber his assets by a new method, greatly to the prejudice of all other creditors."

In People v. Remington & Sons, 54 Hun, 480, 8 N. Y. Supp. 31, it was held by the Supreme Court of New York that where a corporation gave to a creditor certain promissory notes indorsed by third persons and also gave to the same creditor as collateral security its own obligations, called coupon notes and not secured by any lien or mortgage, the creditor could not share in the assets of the debtor on the basis of the

amount of the original claim and also the coupon notes. The court said:

"The question is, can the bank by reason of its holding the coupon notes as collateral security for any obligations against the Remington Agricultural Company or P. Remington, prove the amount of such notes in addition to the debts for which they are held as collateral? This would, in effect, prove the actual debt twice. The coupon notes carried with them no lien on the property of the corporation. * * * The coupon notes were only personal obligations. The bank had certain obligations against the insolvent corporation, partly as maker and partly as indorser, which it has proved for the full amount of its debt. It has another form of obligation against the same corporation for the same debt. This does not increase, as against other creditors, the amount of the indebtedness. Being once proved the right of the claimant in that regard is exhausted. It is not a question as to the adjustment of specific liens, but simply to ascertain the amount, in fact, of the debts of the corporation preparatory to a 'just and fair distribution of the property of the corporation, and of the proceeds thereof, among its fair and honest creditors.' Code Civ. Proc. § 1793. As said in Third National Bank v. Eastern Railroad, 122 Mass. 242, 'A debtor's liability to his creditor, where other creditors are concerned, is not increased by increasing the number of his promises to pay the same debt, in whatever form he may make them. To hold otherwise would be to enable the debtor to incumber his assets by a new method, greatly to the prejudice of all other creditors.' "

This decision was affirmed by the Court of Appeals of New York on the strength of the opinion of the lower tribunal. 121 N. Y. 675, 24 N. E. 1095. In the case of In re Waddell-Entz Co., 67 Conn. 324, 35 Atl. 257, it appeared that in consideration of a loan of $4,500 to a corporation the lender received its demand note for that amount, and also ten bonds issued by the corporation for $1,000 each, referred to in the note as collateral security. The bonds were not secured by a lien on property or obligations of third persons. In default of payment of the principal of the note the payee sold the bonds to himself after the corporation had become insolvent and presented his claim against the estate then in the hands of the receiver for $14,500 on which he claimed dividends. It was held that the bonds were not collateral security and did not justify the claim made. The court said:

"Proctor's claim (aside from the thirteen bonds Nos. 32 to 44, about which no question arises) is based on the loan to the Waddell-Entz Company of $4,500. As evidence of the debt he received a demand note for that amount (Ex. C). He also received ten notes or bonds (in the form of Ex. D) for $1,000 each, and claims that the debt on which he is entitled to a proportionate dividend from the trust fund is $14,500. If he had received a demand note for $14,500, or if he had received 145 notes under seal for $100 each, it would hardly be claimed that he could prove more than his actual debt of $4,500; whatever advantages possession of evidences of debt in such form might secure to him in enforcing his rights against his debtor, the possession of such advantages does not alter the fact that his real debt is $4,500, and that fact must control his right to a dividend from the insolvent estate. The amount of his debt is not altered because in the demand note the ten bonds delivered to him are called 'collateral security.' They are not collateral security for the payment of the original debt. The demand note itself is in a sense a security dependent for its value on the credit and property of the borrower; another note or fifty other notes furnish a similar security; they might aid the creditor in enforcing speedy payment by the debtor, but in case of insolvency it is the actual debt and not the multiplication of evidences of debt that defines the creditor's interest in the trust fund. 'Collateral security' necessarily implies the transfer to the creditor of an interest in some property or lien on property, or obligation which furnishes a security in addition to the responsibility of the debtor.

176 F.—26

The law regulating this subject rests on the assumption of such transfer to the creditor of property in some form, on which he relies for security, and which he is entitled to apply instead of resorting to the debtor's own property towards the satisfaction of his debt, by virtue of a contract implied or expressed as the case may be, but collateral to the contract of indebtedness. A debtor's additional promises to pay cannot, from the very nature of the case, be treated as collateral security for his debt, unless such additional promises are themselves secured by a lien on property or by the obligations of third persons; under such circumstances, they may be treated as collateral security so far as is necessary to obtain the benefit of the lien or obligation. This self-evident proposition has rarely been discussed in reported cases. The principle, however, has been clearly stated by the courts of New York and Massachusetts."

In Freeman's Appeal, 74 Conn. 247, 50 Atl. 748, the court cited with approval In re Waddell-Entz Co., saying:

"When a creditor holds an unsecured note of the debtor simply as collateral to a principal obligation, a dividend cannot be allowed, in case of insolvency, upon any greater indebtedness than that existing independently of such note."

In the case of In re Oriental Bank, Ex parte European Bank, 7 L. R. Ch. App. 99, the court through Sir G. Mellish, L. J., in reversing the decision of the Vice Chancellor, said:

"The principle itself—that an insolvent estate, whether wound up in chancery or in bankruptcy, ought not to pay two dividends in respect of the same debt—appears to me to be a perfectly sound principle. If it were not so, a creditor could always manage, by getting his debtor to enter into several distinct contracts with different people for the same debt, to obtain higher dividends than the other creditors, and perhaps get his debt paid in full. I apprehend that is what the law does not allow; the true principle is, that there is only to be one dividend in respect of what is in substance the same debt, although there may be two separate contracts."

The case just referred to arose under the Companies Act of 1862; but the decision did not turn on any provision in that act, for the court said:

"The case of Rigby v. Macnamara [2 Cox, 415] tends to show that this rule against double proof applies in the Court of Chancery as well as in the Court of Bankruptcy, and therefore would apply equally where companies are being wound up."

International Trust Company v. Union Cattle Co., 3 Wyo. 830, 31 Pac. 408, 19 L. R. A. 640, decided by the Supreme Court of Wyoming, strongly supports the proposition that a creditor of an insolvent corporation is entitled to a dividend only on what is actually due him and has no right to an allowance on account of negotiable bonds of the corporation, representing no actual indebtedness to him, which he claims to hold as collateral security, and, further, that one personal obligation cannot constitute collateral security for another obligation of the same debtor. The court said:

"The Union Cattle Company, one of the defendants, is an insolvent corporation. Frederick P. Voorhees, the other defendant, is sole receiver, in possession and control of all the assets, of the insolvent company, for the purpose of winding up its affairs under direction of the district court, which, on petition of certain creditors, appointed him as receiver. He reports $168,000 on hand for distribution among the creditors. The plaintiffs in error are creditors, holding the promissory notes and negotiable bonds of the company to large amounts as evidence of the indebtedness of the company to them. They also hold the negotiable bonds of the insolvent company for further large amounts, but not representing any further actual indebtedness, but, as they claim, as col-

lateral security for the payment of the actual indebtedness. Plaintiffs claim dividends upon these bonds, as well as upon the bonds and notes representing actual indebtedness, until such indebtedness is fully paid. The district court denied the claim for dividends on the so-called collateral security. By several assignments of error the plaintiffs in error raise in this court the sole question of the correctness of this order of the district court. This is a case of insolvency, and the object of the suit, as authorized by the law, is to wind up the affairs of the insolvent company, convert its assets into money, and apply the money, pro rata, in payment of the debts. Plaintiffs seek more than a pro rata payment on the actual indebtedness of the company to them. The mere statement of the case would seem to exclude plaintiffs' claim, in the absence of any lien upon or pledge of specific assets. * * * A debtor's own personal obligation is no part of his personal property or assets. The so-called collateral security in the case at bar is in the form of bonds of the debtor. But they are not secured in any manner. They are the mere obligations of the debtor, and there is no reason apparent for exempting them from the operation of the rule announced by Colebrooke. They do not constitute a lien upon the assets of the debtor, or upon any portion of them. 'Collateral security imports a security in addition to the personal obligation of the borrower.' * * * Cases cited to the contrary are either where there is a mortgage or other lien upon specific assets to be enforced, or where the collateral paper has been transferred by the creditor and pledgee for value."

The case of In re Sherry, 101 Wis. 11, 76 N. W. 611, is in principle identical with that before this court. One Sherry made a voluntary assignment for the benefit of his creditors. At that time he was indebted to a national bank in the sum of $1,500 for which it held his note in that amount. The bank also held as collateral security for the payment of that note a note of a corporation in an equal amount, payable to the order of Sherry, and by him indorsed. The bank made proof of its claim against Sherry's estate for $1,500 on his own note, and also sought to make proof of the further sum of $1,500 on account of his indorsement of the note of the corporation. The assignment law of Wisconsin contemplated, as do the general principles of equity, subject to established liens, priorities and preferences, an equal or pro rata distribution of the assets among creditors. The court below held that such double proof could not be made. The Supreme Court on appeal affirmed this decision and said:

"Sherry owed the bank absolutely $1,500, and put up the note of a corporation for the same amount, indorsed by himself, as collateral to his indebtedness. The bank has proved its claim against Sherry's estate for the $1,500 debt, and now desires to prove a claim for a like amount by reason of the indorsement of the collateral note. * * * Sherry owed the bank $1,500, and no more, nor did he increase that debt when he indorsed to the bank the collateral note of $1,500. True, he entered into a distinct obligation, but he did not increase his debt. The new and distinct obligation was practically another promise to see that his previous debt was paid, because Sherry's indorsement amounted simply to a promise that the bank would realize enough out of the collateral to pay his (Sherry's) debt. Thus the bank then held two promises made by Sherry to pay the same debt. As between Sherry and the bank, the situation was practically the same as if Sherry had given his own note as collateral to the first note. We apprehend that none could claim that under such circumstances both notes could be proven as debts, and share in the dividends. If so, then an easy way has been found to evade the provisions of the assignment law, and provide for the payment of one creditor in full, while others receive but a percentage. However we look at it, the substantial fact remains that both of Sherry's promises held by the bank, though different in form, represent but one debt, and both will be discharged by the payment of that debt. Nor would the situation of the bank be different if it had obtained judgments against Sherry on both claims, and were attempting to prove them both against his es--

tate. Both judgments would represent but one debt, and would be satisfied by payment of that debt. Now, as before stated, the object and purpose of the assignment law are to apply the insolvent's estate equally so far as it will go to the payment of his debts. It nowhere says, either directly or by implication, that a creditor who holds two promises by the insolvent to pay the same debt shall have the right to prove both of them. It says that 'debts due or to become due' may be proven, but does not say that several promises to pay the same debt, if different in form, may all be proven. Certainly, the law should not be construed so as to permit one creditor, who holds two promises of his debtor to secure the same debt, to receive twice as much from the estate as another creditor to the same amount who is so unfortunate as to hold but one promise, unless such construction is a necessary result from its plain provisions. We do not find any provisions that make such a result necessary or even proper; hence the purpose and spirit of the law, which is to afford an equal distribution of the estate to all creditors in proportion to their honest claims, can be carried out."

Nor is a creditor entitled in bankruptcy, aside from some established lien, preference or priority, to receive a double dividend on the same claim out of a single fund. This does not result from any doctrine peculiar to bankruptcy, but from equitable principles applied in the administration of the bankruptcy system. The case of In re Sterling, Aherns & Co. (D. C.) 1 Fed. 167, arose under the bankruptcy act of 1867 (Act March 2, 1867, c. 176, 14 Stat. 517) but was decided on equitable principles. Judge Morris, delivering the opinion of the court, said generally and without qualification:

"One sound and well established rule applicable to the settlement of insolvent estates is that the estate must never pay two dividends in respect of the same claim."

In First National Bank of Beaumont v. Eason, 149 Fed. 204, 79 C. C. A. 162, a bank sought to make proof in bankruptcy on a note made by the bankrupt and on a note indorsed by the bankrupt and given to secure the payment of the first note. The Circuit Court of Appeals for the Fifth Circuit held that this could not be done, saying:

"The appellant has two obligations of the bankrupt, one is on a note for $15,000, of which the bankrupt was maker, the other is on an indorsement on a forged note for $15,000, given as collateral to secure the first-mentioned note. The appellant seeks to prove both obligations against the bankrupt's estate. There was only one consideration, really only one debt, and the appellant is entitled to only one satisfaction. The payment of either obligation would extinguish the other. The district court held that the appellant could not prove both and thus establish a double liability against the bankrupt's estate. The decree appealed from is affirmed."

It is undoubtedly true, as held in Board of County Com'rs v. Hurley, 169 Fed. 92, 94 C. C. A. 362, that "the obligee in a bond, or the holder of a claim, upon which several parties are personally liable, may prove his claim against the estates of those who become bankrupt and may at the same time pursue the others at law, and, notwithstanding partial payments after the bankruptcy by other obligors or their estates, he may recover dividends from each estate in bankruptcy upon the full amount of his claim at the time the petition in bankruptcy was filed therein until from all sources he has received full payment of his claim, but no longer." But this proposition does not in any way involve the allowance of double dividends to an unsecured creditor out of one and the same fund upon one and the same claim. The distinction is

between receiving such double dividends on the one hand and, on the other, proving the claim against and receiving dividends from several distinct funds respectively liable for its payment.

The counsel for the banks referred at the hearing to certain dicta in Murphy v. Murphy, 74 Conn. 198, 50 Atl. 394, and Allen v. Dallas & W. R. Co., 3 Woods, 316, Fed. Cas. No. 221, as tending to support his contention. In Murphy v. Murphy a promissory note for $600 secured by a mortgage on real estate was made and delivered by a debtor to secure the payment of a real indebtedness of $175. Action was brought on the note for $600 against the maker and it was held that, the plaintiff being innocent of fraud, a recovery properly could be had thereon for the amount of the real debt of $175, with interest, the court saying:

"We think the facts fairly justify treating the note secured by the mortgage as a collateral security for an existing indebtedness of $175. Such a security gave the plaintiff not only the right to appropriate the land pledged for the satisfaction of the principal indebtedness, but also the right to whatever advantage there might be in the ability to sue the defendant upon the note given as security as well as upon the principal debt. In re Waddell-Entz Co., 67 Conn. 324, 334 [35 Atl. 257]."

The decision in Murphy v. Murphy was in line with the suggestion in the case of In re Waddell-Entz Co., at page 334 of 67 Conn., at page 258 of 35 Atl. of "advantages possession of evidences of debt in such form might secure to him [the creditor] in enforcing his rights against his debtor," and with the statement on the same page that the multiplication of notes for the same demand "might aid the creditor in enforcing speedy payment by the debtor." The decision is not in the least inconsistent with the views, already quoted, expressed in the earlier case as follows:

"In case of insolvency it is the actual debt and not the multiplication of evidences of debt that defines the creditor's interest in the trust fund."

In Allen v. Dallas & W. R. Co. it appeared that a railroad company had executed a mortgage of all its property, real and personal, acquired and thereafter to be acquired, to secure an issue of two hundred and fifty of its bonds, each for $1,000. The company being indebted to one Calder in the sum of $20,000 caused sixty of such bonds to be transferred to him as collateral security for the payment of his claim, and thereafter, having made default in its payment, the bonds were in conformity with the terms of the contract of pledge duly exposed to sale and bought by Calder who thereby became their absolute owner. The remaining 190 bonds were delivered by the railroad company to the contractor for the construction of the road and were transferred to an agent of the Kansas Rolling Mill Company as trustee as collateral security for the payment of certain notes given by the contractor for iron furnished for the road. The contractor having made default the bonds were exposed to sale and purchased by one Doane. The court said:

"Even if the bonds were still held by Alexander Calder and the Kansas Rolling Mill Company as collateral security, they would be bona fide holders for value and entitled to enforce the payment of the bonds, as long as the debts for which they were hypothecated were unsatisfied."

No question of double dividends on the same claim was presented, considered or suggested, nor did or could any question arise as to participation in general assets in contradistinction to the proceeds of mortgaged property, for all the property, both real and personal, was covered by the mortgage securing the bonds. The dictum has no conceivable bearing on the present case. No case or unambiguous dictum lending aid to the contention on the part of the banks has been presented to the court, nor after diligent search am I aware of the existence of any such case or dictum.

If the first mortgage bonds held by the banks had been validly transferred to them as collateral security by a third person the case would have presented a totally different aspect and the banks would have been entitled by way of collateral security to participate pro rata not only in the proceeds of the mortgaged property but, subject to established preferences and priorities, in the general assets. For in such case the transferred bonds, while collateral security as between the banks and such third person, would have represented absolute indebtedness and liability to pay on the part of the steel company. But such is not this case. The banks still hold the first mortgage bonds of the steel company as collateral, and the question here presented is in principle purely one of double dividends on the same claim from the same fund; for there is no room for a distinction between such double dividends and the receipt of dividends from the general assets computed upon both the face value of the bonds and the amount of the real indebtedness of the steel company to the banks.

But wholly aside from the foregoing considerations and cases the contention made on behalf of the banks cannot be sustained. It is irreconcilable with the doctrine and reasoning of Merrill v. National Bank of Jacksonville, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640. The court, in reaching the conclusion that a creditor of an insolvent corporation is entitled in equity to share in its general assets on the basis of the amount of his real claim as existing at the time of the declaration of insolvency, regardless of any collateral security for the debt held or realized on by him since that time, said:

"Doubtless the title to collaterals pledged for the security of a debt vests in the pledgee so far as necessary to accomplish that purpose, but the obligation to which the collaterals are subsidiary remains the same. The creditor can sue, recover judgment, and collect from the debtor's general property, and apply the proceeds of the collateral to any balance which may remain. Insolvency proceedings shift the creditor's remedy to the interest in the assets. As between debtor and creditor, moneys received on collaterals are applicable by way of payment, but as under the equity rule the creditor's rights in the trust fund are established when the fund is created, collections subsequently made from, or payments subsequently made on, collateral, cannot operate to change the relation between the creditor and his co-creditors in respect of their rights in the fund. * * * We repeat that it appears to us that the secured creditor is a creditor to the full amount due him, when the insolvency is declared, just as much as the unsecured creditor is, and cannot be subjected to a different rule. And as the basis on which all creditors are to draw dividends is the amount of their claims at the time of the declaration of insolvency, it necessarily results, for the purpose of fixing that basis, that it is immaterial what collateral any particular creditor may have. The secured creditor cannot be charged with the estimated value of the collateral, or be compelled to exhaust it before enforcing his direct remedies against the debtor, or to surrender it as

a condition thereto, though the receiver may redeem or be subrogated as circumstances may require.* * * * Our conclusion is that the claims of creditors are to be determined as of the date of the declaration of insolvency, irrespective of the question whether particular creditors have security or not. When secured creditors have received payment in full, their right to dividends, and their right to retain their securities cease, but collections therefrom are not otherwise material."

In Corbett v. Joannes, 125 Wis. 370, 381, 104 N. W. 69, 73, the court in referring to the doctrine of the Merrill case on this point, said:

"In applying the doctrine thus established courts treat the right of a secured creditor in the trust fund as a thing somewhat distinct from the indebtedness itself. The debt as it existed at the time of the creation of the trust is regarded as the measure of the proportional interest of the creditor as a cestui que trust in the trust fund, while it has a separate existence as regards the security till it is paid or the security exhausted. Payments thereon whether from the trust fund or from the security reduce the same but do not change in any respect the basis of the beneficiary right so long as any part of the indebtedness remains unpaid."

It thus appears that the secured and the unsecured creditor stand in equity on precisely the same ground with respect to participation in the general assets of an insolvent corporation. The former "is a creditor to the full amount due him, when the insolvency is declared, just as much as the unsecured creditor is, and cannot be subjected to a different rule. And as the basis on which all creditors are to draw dividends is the amount of their claims at the time of the declaration of insolvency, it necessarily results, for the purpose of fixing that basis, that it is immaterial what collateral any particular creditor may have." The contention by the banks that, although the first mortgage bonds of the steel company admittedly were delivered to and are held by them solely as collateral security, they are entitled to dividends computed on the basis, not of the amount of the real indebtedness to them at the time of the declaration of insolvency, but of that amount plus the face value of the collateral bonds, is directly in the teeth of the language of the Supreme Court, and would involve, if sustained, a repudiation by this court of the underlying principle of the Merrill case. Further, in that case it was declared, as has already appeared, not only that "the secured creditor cannot be charged with the estimated value of the collateral, or be compelled to exhaust it before enforcing his direct remedies against the debtor, or to surrender it as a condition thereto," but that, "as under the equity rule the creditor's rights in the trust fund are established when the fund is created, collections subsequently made from, or payments subsequently made on, collateral, cannot operate to change the relations between the creditor and his co-creditors in respect of their rights in the fund." Here is the clearest recognition of the right of the secured creditor to enforce his collateral at his election either before or after participating in the general assets on the basis of the real indebtedness existing at the time of the declaration of insolvency. Now, if it be assumed that the first mortgage bonds of the steel company held by the banks are collateral security attaching to the general assets, the idea of the existence of an election to enforce such collateral against such assets before or after participation therein on the basis of the amount of the real indebtedness practically becomes

an absurdity. On the above assumption the collateral security with respect to the general assets would be the pro rata share computed upon the face value of such first mortgage bonds. The banks would not realize from the general assets on such security without the declaration of a dividend applicable at once to the real indebtedness to them of the steel company as well as to the collateral; for it is not to be supposed that they would abstain from proving the amount of such indebtedness and claiming a dividend thereon merely for the sake of first enforcing the collateral. Nor on the above assumption is it reasonable to suppose that the banks would, at the peril of wholly losing the benefit of their collateral with respect to the general assets, omit to present and prove such collateral until after the declaration and payment of dividends out of such assets upon the real indebtedness. The repugnancy between the views of the Supreme Court in the Merrill case and the contention of the banks is palpable and it is unnecessary to dwell longer on this branch of the subject.

The banks have not sought to use the first mortgage bonds held by them as collateral as an alternative or cumulative medium of proof to establish or support their actual claims against the steel company, but to enlarge the share of the general assets to be received by them in the shape of dividends.

The Supreme Court certainly has not leaned against the interests of the collateral-holding creditor in deciding that in case of insolvency he is entitled to "prove for, and receive dividends upon, the full amount of his claim, regardless of any sums received from his collateral after the transfer of the assets from the debtor in insolvency, provided that he should not receive more than the full amount due him." But here the court is asked to go much farther and hold that the creditor may not only enforce the collateral bonds against the proceeds of the mortgaged property, without which the bonds would not constitute collateral security at all, and prove and receive dividends from the general assets upon the full amount of his real claim, but receive in addition from such assets dividends computed upon the face value of the bonds. To do this I am satisfied on both reason and authority would not only work an injustice to unsecured creditors but be repugnant to settled principles of equity applicable to insolvent estates. The latter of the two general questions arising in this case must, therefore, be answered in the negative, with the result that in the case of The Fourth Street National Bank of Philadelphia the basis for the computation of dividends from the general assets must be reduced from $39,803.22, as reported, to the sum of $20,336.67, the amount of the actual indebtedness of the steel company to that bank, including interest, on December 12, 1904, the date of the declaration of insolvency, and in the case of the Manufacturers' National Bank of Philadelphia the basis for the computation of such dividends must be reduced from $16,453.36, as reported, to the sum of $4,158.70, the amount of the actual indebtedness of the steel company to that bank, including interest, at the last mentioned date. Let an order be prepared in accordance with this opinion.